█

### CORRADO SOCIETA ANONIMA DiNAVAGAZIONE v. L. MUNDET SONS, Inc.

### No. 71 of 1928.

District Court, E. D. Pennsylvania.
Sept. 22, 1936.

38

Howard H. Yocum, of Philadelphia, Pa., and Homer L. Loomis and Thomas F. Peterson, Jr., both of New York City, for cross-libelant.

John Hemphill, of Philadelphia, Pa., and Henry N. Longley and Ezra G. Benedict Fox, both of New York City, for cross-respondent.

KIRKPATRICK, District Judge.

### Pleadings and Proofs.

This is an action commenced by way of cross-libel by the owner of the Italian steamship Albisola for the recovery of a general average contribution in the sum of $46,789.60, arising from losses, expenses, and sacrifices incurred as a result of the stranding of the Albisola while proceeding out of St. Georges Harbor, Bermuda. The original libel was filed by the cargo owner for damage to the cargo. Proceedings under it have been stayed for noncompliance with an order requiring security to be entered. The cargo owner filed an answer to the cross-libel, setting up first; initial unseaworthiness of the ship —a defense not pressed—and, second, negligent navigation causing the stranding. Upon this issue testimony was taken.

By amendment, allowed by the court at the hearing, after notice, the cross-libelant introduced, as a further cause of action, that, by assenting 'to an adjustment by Johnson and Higgins, average adjusters of New York, the cross-respondent had bound itself to pay the amount of the average settlement, regardless of any question of legal liability for the original average contribution.

### Findings of Fact.

1. The Albisola is a freighter of 5,240 tons gross, and dead weight capacity of 8,200 tons. Her length is 366 feet and her beam 50 feet 6 inches. Her maximum speed is approximately 8 knots.

2. On December 27, 1927, the Albisola lay in the harbor of St. Georges, having been obliged to put in for additional coal in the course of a voyage from Lisbon, Portugal, to New York. She was laden to her capacity with a cargo of cork wood, the total weight of which was some 1,500 tons. Consequently, although she had a molded depth of 31 feet 6 inches she lay high in the water, the distance from the water line to the main deck being 17 feet at the bow and 14 feet 6 inches at the stern. In addition to the cargo in the hull she carried some 2,500 bales of cork on deck forward which were stowed to a heighth of some 6 feet above the bulwarks or a total of possibly 10 feet in all above the deck.

3. After bunkering, the Albisola left her point of anchorage at 2 o'clock in the afternoon of December 28th. The weather was clear but cloudy, with good visibility. She was under the direction of a competent Bermuda pilot who is now dead.

4. The course to deep water lay due east through what is known as the Town Cut, a very narrow and almost perfectly straight dredged channel a little more than a mile in length varying in width from 90 feet at its narrowest to something over 220. About halfway out it passes between the point of St. Georges Island on the north, and two small, rocky islands (Horseshoe Island and Higgs Island) on the south. Between the latter island and St. Georges it is about 160 feet wide. Outside of St. Georges Island to the north of the channel, there are numerous rocks, reefs, and shallows. At several places the depth is as little as 2 feet. There are almost always breakers over these shallow spots.

5. The Albisola proceeded through Town Cut Channel at a speed of about 7 knots, keeping in the middle of the channel. Upon emerging beyond the point of St. Georges Island (at 2:10) she was forced over to the right-hand side of the channel and struck Higgs Island but did

not go aground. Being unable to turn in the narrow channel, she proceeded at the same speed, and at a point a short distance from where she first struck she was again forced out of the channel on the right side and went hard aground (2:30) in water varying from 12 to 22 feet in depth.

Comment: The foregoing facts are all undisputed except possibly the finding as to the speed of the Albisola. Upon this point I accept the testimony of the witness Bergsten, who pointed out that with her type of boilers she would not have had time to gather her maximum speed.

6. The Albisola was driven from her course by the force of a northeast wind, blowing at a rate of somewhat more than 20 miles per hour which first struck her as her bow came out beyond the point of St. Georges Island.

Comment: The foregoing finding goes to the heart of the whole controversy. The issue was, wind or current. If it was the wind which caused the vessel to strand, then it was negligent for her, light-laden as she was, high in the water and with an additional deck load forward, to attempt to leave the harbor under conditions which if ascertained would have warned of danger. If, on the other hand, the efficient cause was a sudden and powerful current, then there was no fault, because all agree that such a current, if it existed, would be extraordinary, unprecedented, and unforseeable.

The only witnesses of what happened were the master and a young colored man named Smith, who had come out with the pilot and was in a small rowboat or gig which was being towed by the Albisola on her port side about midship and which was being kept about 4 feet away from her by means of a rudder. The master's testimony was that, while in the narrowest part of the channel, he noticed on the port bow a current and at the same time heard the pilot shout, "Look, look, extra current"; that as the bow came out of the sheltered zone, the current and the wind sheered it so that the ship struck Higgs Island in spite of the rudder fully starboard helm; that, having cleared Higgs Island, the current, which was becoming stronger, again forced the ship from her course; and that the final stranding was caused by the current, which, without the wind, would alone have been sufficient. Smith testified that a wind was encountered from the northeast, the approximate

strength he did not give, but it was stronger than the wind in St. Georges Harbor. There were sudden waves, perhaps 5 or 6 feet high, which caused the little boat to take in water. There was also, he said, a current, but you could not notice any effect of it upon the gig. He gave his opinion of the cause of the stranding as "wind and tide."

There are several bits of evidence which, when carefully considered, are extremely significant. (a) Except in one place, both the testimony of the master and the ship's log always couple wind with current as a force responsible for the stranding. In answer to the direct question, "What was the cause of the stranding?" the master answered, "Current and wind." (b) Immediately after the ship went aground, the high-lying cargo stored on deck forward was jettisoned, "so as to have the vessel offer less resistance to the wind, and prevent the vessel driving further in." This rather extreme measure strongly argues a much greater amount of wind than the less than 10-mile breeze which the cross-libelant contends was blowing. (c) The 5 or 6 foot waves which caused the gig to ship water are much more likely to have been produced by a strong wind than by any current, in spite of Smith's assent to the suggestion made to him by counsel that the current produced the waves. I do not believe that a current which had no effect upon the small gig in driving it against the ship could possibly have piled up the water in that fashion.

As to the force of the wind: Between 21 and 23 miles per hour would probably be about right. The master, referring to the Italian scale, gave it a force of 3.4. Without going into the elaborate arguments advanced on this point, I would translate that as about 5.8 on the Beaufort scale. Five on the Beaufort scale is 17 miles per hour, 6 is 22 miles. A 28-mile wind on the Beaufort scale is classed as a moderate gale, 22 is a strong breeze, 21 a fresh breeze. In considering the master's testimony, it may be assumed that he would not overstate, and might understate.

The official weather report of the Bermuda Islands shows that the wind on Prospect Hill, several miles away, was 20 miles per hour. In my judgment, the testimony offered by the cross-libelant, designed to show that the wind off the point of St. Georges Island would be much light-

er than on Prospect Hill, wholly fails to establish the point. In fact it is directly contradicted by the master's testimony that it was 3.4 on the Italian scale, a force very close to 21 miles.

As to the current: In passing upon the master's testimony, one has in mind that he could hardly be expected to emphasize a cause which might make him responsible, and it is not impossible that the wind on the surface water and the breakers to port combined to give both him and Smith an impression that there was a current when, as a matter of fact, he was being forced over by the wind. He gives the speed of the current as "4. 5." If by this he means 4½ knots, his story becomes a great deal more difficult to accept. Such a current, suddenly appearing, would indeed have been an extraordinary phenomenon. While the winter of 1927–28 had been unusually severe on the North Atlantic, neither of the two heavy storms prior to December 28 had passed within a thousand miles of Bermuda and could not have disturbed the local waters so as to account for appearance of such a current. I find that if there was any current running from the northeast, it was so slight as to be negligible. Then there is also the testimony of Foggo, another pilot, who was at sea that day and who returned after the disaster. He lived directly opposite to the point where the ship went aground. His testimony was that there was no unusual current on that day and that there could not have been any without his being aware of it. His testimony leaves his precise opportunities for observation in doubt, but it must be taken as a factor in the whole picture.

7. The stranding of the Albisola was due to negligence in navigation in attempting to leave the harbor under the existing conditions.

Comment: It was possible and easy to ascertain exactly how much wind was blowing off St. Georges Island before the ship sailed. She was light-laden with an unusually large area of hull and deck load exposed to the wind. She had to pass through a very narrow channel which, with her 50-foot beam, rarely gave her a clearance of over 60 feet on either side and which, at the point of grounding, gave her only 30. The importance of an exact knowledge of the wind which she would have to encounter need scarcely be pointed out. She sailed without any such information. Of course the comparatively light breeze which was blowing in the sheltered harbor of St. Georges could give no knowledge of what it was like outside. Everything necessary could have been ascertained in ten or fifteen minutes and the evidence shows that this was frequently if not usually done. One experienced navigator testified that he would not send his ship out under the existing conditions, and that "she would be looking for trouble the moment her bow stuck out there." Another testified that it was not safe to take her out with that strength of wind blowing and that she ought to remain at anchorage until the wind moderated.

## Conclusions of Law.

■ 1. The case is not one for general average contribution, because the stranding from which the losses, expenses, and sacrifices resulted was caused by negligent navigation.

2. The average agreement signed by the cross-respondent does not bind it to pay the amount shown to be due by the average statement, regardless of the cause of the stranding.

Discussion: The first of the foregoing conclusions does not require elaboration. It is an elementary principle of the law of average. The charter party in the present case did not contain a Jason clause.

As to the second conclusion: It appeared that upon arrival in New York, and before discharge of the cargo, the cross-respondent, in order to obtain delivery, signed an agreement which is in evidence by which it covenanted that " * * * so much of the losses and expenses aforesaid as upon an adjustment of the same to be stated by Johnson & Higgins, Average Adjusters, according to the provisions of the contract of affreightment and to the laws and usages applicable, may be shown by the statement to be a charge upon said cargo, * * * shall be paid by us. * * *" This is a familiar form of average agreement, and substantially similar agreements or bonds have been before the courts many times. I do not find that the contention has ever been made that the legal operation and effect of an average agreement of this kind is anything more than to fix the measure of the obligor's liability and secure payment of the amount unless it shall afterward appear that it was not a case for general average. 24 R.C.L., § 556, p. 1450; Cheraw & Sal-

isbt.ry Railroad Company v. Broadnax, 109 Pa. 432, 1 A. 228, 58 Am.Rep. 733.

Average agreements or bonds are allowed and recognized by the admiralty courts, as a substitute for the common-law lien for general average which the ship owner has upon the cargo. The ship owner who attempted to enforce his lien by holding the cargo against a tender by the cargo owner in settlement of general average found himself in a difficult position. He was bound to assert his lien for the benefit of other interests, The Santa Ana (C.C.A.) 154 F. 800, but it was impossible to fix the amount accurately until the cargo had been valued and that could not be done until after delivery. Besides, if he undertook to hold it after discharge, though he might not lose his lien, he would have to bear the cost of warehousing it. As a result, the practice early obtained of exacting agreements of this kind from the cargo owners, sometimes in the form of a bond with surety, sometimes accompanied by a deposit, and sometimes guaranteed by the underwriters.

The origin and history of average agreements is fully discussed in Huth v. Lamport, 16 Q.B.D. 442, 735, and in the American cases of Wellman v. Morse (C. C.A.) 76 F. 573, 581; The Nesco (D.C.) 47 F.(2d) 643; Lowndes, General Average (6th Ed.) § 77; Congdon, General Average, p. 156.

■ Since the agreement in its essence was intended to take the place of the lien, it would seem but reasonable that the ship owner's rights under it should rise no higher than what they would be if he were asserting his lien.

The Nesco, supra, The Caserta, 1932 A. M.C. 51, and the recent Supreme Court decision in the United States v. Atlantic Mutual Ins. Co. (May 25, 1936) 298 U.S. 483, 56 S.Ct. 889, 80 L.Ed. 1296, all have to do with the admissibility and effect as evidence of a general average statement prepared ex parte at the direction of the ship owner and are consequently beside the point. In Wellman v. Morse, supra, however, the ship owner required a bond very similar to the agreement in this case. The cargo owner refused to sign it without an additional provision, and one of the questions involved was, whether the cargo owner had the right to insist upon his proposed addition. The court held that it was unreasonable to ask for it. Stating the rights and liabilities of parties on the tender of

an average agreement, the court said, " * * * the result of the case [Huth v. Lamport] shows that anything which in substance demands more than this, [referring to a form of average agreement known as the 'London Form' which was conditioned in the simplest terms to pay the obligor's share of general average when called upon] or which would in any way prejudice the owner of the cargo in denying the entire liability, or in questioning the amount of it if the liability was established, or which would close any of the methods which the law gives for ascertaining and determining the existence or extent of liability, cannot receive the approval of the courts. On the other hand, it is evident, reciprocally, that the master, on surrendering his lien, is entitled to demand security of an effectual character, and of such nature as will leave open, in his behalf, all legal methods of determining any controversy which may arise, and of promptly enforcing whatever amount the result of such determination may show he is entitled to. While, on the one hand, he cannot foreclose any questions which the owner of the cargo is entitled to have determined," etc. After thus pointing out the limits of what the ship owner was entitled to demand, the court held that the average bond without the clause insisted upon by the cargo owner, met the legal requirements.

■ The cross-libelant relies strongly upon the New York case of Rebora v. British & Foreign Marine Ins. Co., 258 N.Y. 379, 180 N.E. 90, 91. That was a suit at law, not upon the average agreement, but upon a guaranty given by the defendant insurance company. The bill of lading bound the cargo owners when they shipped their goods to sign an agreement for general average contribution in terms much more sweeping than those in any other case cited. The average agreement so executed said "we further agree to fully recognize and to satisfy without litigation the findings of such adjustment, not to oppose by any means the adjustment and settlement to be presented by the adjusters in fulfillment of the charge conferred upon them." The intention is clearly manifested to be bound to general average contribution regardless of the cause of the loss or at the very least to submit the matter to the adjusters as an absolute arbitration. The distinction between this and the present agreement is too obvious to require discussion. Even so, Judge Mack in The

Caserta, supra (which arose under the same documents), expressed doubts as to whether the findings of the adjusters were conclusive in all particulars. The New York case is clearly distinguishable, but even if it were not it would not bind this court, although entitled to the greatest respect.

Turning to the agreement itself, it may be briefly noted that its terms are more than merely suggestive of the view that the right to contest the existence of any liability on the ground that the case was not one for general average was carefully preserved. The recitals are that "it is alleged" that in the prosecution of her voyage, the vessel stranded and floated with assistance, and that by reason of occurrence of the voyage, certain losses, etc., were incurred which "may" constitute a charge by way of general average upon the cargo. The adjustment is to be stated "according to * * * the loss laws * * * applicable." In The John M. Chambers (C.C.) 24 F. 383, an average bond in terms quite as broad as the one in this case, did not preclude the cargo owner from contesting the question whether the expenses and sacrifices resulted from faulty navigation, although, as a matter of fact, that point was decided against him.

Enough has been said, I think, to indicate that the argument of the cross-libelant, based upon the supposedly binding effect of the average agreement, is entirely without merit.

A decree may be submitted in accordance with the foregoing findings and conclusions.