## NAVIGAZIONE GENERALE ITALIANA v. SPENCER KELLOGG & SONS, Inc. *

### THE S. S. MINCIO.

### No. 468.

Circuit Court of Appeals, Second Circuit.
Aug. 9, 1937.

Loomis, Williams & Donahue, of New York City (Homer L. Loomis, of New York City, of counsel), for appellant.

---

*Writ of certiorari denied 58 S.Ct. 271, 82 L.Ed. ——.

Bigham, Englar, Jones & Houston, of New York City (Martin Detels and Charles W. Harvey, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from a final decree in admiralty dismissing the libel in a suit brought by the owner of the steamship Mincio for the recovery of cargo's contribution to general average losses and expenses in respect to the Mincio's engines and rudder and kindred damages alleged to have been sustained by her in working free from the strand in the Parana river on October 9 and 10, 1926, whereon she lay for about thirty-six hours. The general average adjusters reported that the total damage as a result of the stranding was $50,552.43, that $40,503.33 thereof was particular average chargeable to the owner of the vessel alone, and that the balance amounting to $10,049.10 was general average chargeable to both ship and cargo. The libelant in this suit, brought for the cargo's proportion of the last-mentioned item, sought recovery of $6,451.16.

The Mincio, a steel single screw steamer of from 7,000 to 8,000 tons, was overhauled at Genoa two months prior to the stranding where she had received the highest classification from the Italian Lloyds. She left Rosario in the Argentine on October 7, 1926, having at that port taken on board a partial cargo of 232,947 bushels (or 5963 tons) of linseed in bulk belonging to the respondent. She was in charge of a local compulsory pilot and was bound for Buenos Aires, where she was to complete her cargo of linseed in bulk by loading about 1,000 tons additional. She was to carry the cargo of linseed in bulk to New York under a charter party between Spencer Kellogg & Sons of South America, which excepted strandings, and provided that "average if any" should be "payable according to York-Antwerp Rules of 1924."

When the Mincio, with a draft of 22 feet, 6 inches, had proceeded down the Parana river as far as Martin Garcia Station, she came to anchor at 2:45 p. m. October 8, because the water was running too low in the channel for safe navigation. At 9:45 a. m. October 9, after a signal from the government semaphore that the water in the channel had reached a depth of 22 feet, 8 inches, she weighed anchor by order of her pilot and resumed her voyage down the river. About 10:15 a. m., as she was nearing buoy K–93 just above the entrance of Nuevo Channel, she stranded on the muddy, sandy bottom of the river. The river there is approximately 14 miles wide and the distance from the Uruguayan coast from 2 to 2½ miles. The width of the navigable channel at the point of stranding is about 150 feet, and the depth of water according to the soundings taken by the first officer, accompanied by the second officer, shortly after grounding, was 22 feet, 1 to 2 inches, at the bow and stern, and 23 feet at the center of the vessel. As soon as the vessel grounded, she lay on the bottom of mud and sand a little to the left side of the channel. Her engines were at once stopped and her anchors run out, including a kedge anchor run to the "starboard aft" in order to prevent the wash of any vessel passing on the starboard from pushing her stern "against the nearby bank." The place where the stranding occurred was within the zone of the Pamperos or South American hurricanes. There was evidence that such a hurricane, coming as it ordinarily does from the southwest, would tend further to lower the depth of the water. In any event it would rock, pound, and strain the vessel. The master of the Mincio testified that there was "danger of opening up seams in the plating of the steamer," though he said "the vessel was resting on an even keel with a slight list to starboard." The second officer testified that the ship was resting on the bottom at the bow and at the stern but not in the center, that, as the cargo was in the center, the ship would be strained, and, if the wind increased in velocity, might be pushed further into the bank of the channel so that, in order to proceed, she would have to be lightened and the cargo discharged. The master thought that the danger was not "immediate," but the second officer stated that it was imminent. If a serious leak developed by reason of the opening of the seams, the linseed would have been damaged and would tend to swell and choke the pumps and perhaps burst the ship's plating.

After the Mincio had stranded, the master notified the ship's agent at Buenos Aires that she had stopped at buoy K–93

"for insufficiency of water" and the agents sent a tug with an official on board from the harbor master's office. The steamer attempted to get off the strand by running her engines full speed astern from 11:30 a. m. to 11:45 a. m. This was done because it was thought that the water had risen sufficiently so that she could be floated, but the attempt met with no success. On October 10, according to the engine log, the engines were again run from 11:30 to 11:45, also from 12 noon until 4 p. m., and again from 7:30 p. m. to 10:30 p. m., when the vessel got free from the bar. During the time she was aground her deck crew were engaged in taking soundings of the channel from small boats and in taking soundings of the bilges of the different holds.

After being released from the strand, the Mincio proceeded to Buenos Aires, a survey of her engines and the rudder transmission lines was held, and slight repairs to them were made. After she reached New York and discharged her cargo she was drydocked. It was then found that seventeen plates forward on the port side of the bottom of the ship were more or less badly set up or indented and the rivets and landings were leaking. Approximately 5,000 rivets scattered through the bottom plating were leaking, the cement in the double bottom on the port and starboard side was broken and disturbed from forward to aft of amidships, the frames, the floors and intercostals in the way of the damaged plating on the port side were more or less started and buckled and rivets were broken off. Rivets were leaking in No. 1 and No. 2 tank margins and there was also substantial damage to the ship's engine and steering machinery.

On the discharge of the cargo at New York, the owner of the Mincio asserted a general average lien, and in consideration of the surrender of that lien the appellee agreed in writing that, if Johnson & Higgins were appointed adjusters to determine whether and to what extent the damage constituted general average according to the provisions of the contract of appointment and to the laws and usages applicable to the case, it would pay to the owners of the vessel or Johnson & Higgins according to its ratable proportion so much of the losses and expenses as upon an adjustment of the same to be stated by Johnson & Higgins might be shown by the statement to be a charge upon the cargo. Johnson & Higgins made a general average adjustment according to which $6,451.16 was chargeable to the cargo and recovery of that amount is sought by the owners of the Mincio in the present suit.

The errors assigned by the appellant are that the District Court erred (1) in holding that there was no danger threatening the vessel sufficient to constitute a case in general average and (2) in not enforcing the agreement to pay whatever the average adjusters should find to be due to the shipowner.

■ There must be fair reason to regard a vessel in peril in order to require a contribution in general average. While the courts in some cases have used expressions indicating that both in general average and in salvage cases it is essential that the property at risk be subject to an immediately impending danger, we think the "imminency" of the peril is not the critical test. If the danger be real and substantial, a sacrifice or expenditure made in good faith for the common interest is justified, even though the advent of any catastrophe may be distant or indeed unlikely. In pointing out the broad discretion which must be allowed in such cases to the master of the vessel, Judge Hough said in Willcox, Peck & Hughes v. American Smelting & Refining Co. (D. C.) 210 F. 89, 91: "If he finds danger in a land-locked harbor, in shallows, at anchor, or moored to a wharf, it should be no answer to register a landsman's opinion as to the necessary absence of danger at such a place."

As Curtis, J., said in Lawrence v. Minturn, 17 How. 100, 109, 15 L.Ed. 58, where the necessity of a jettison of cargo was questioned: "It is true, that when it was actually made, the sea was smooth, and the ship in no immediate danger. But it satisfactorily appears, that these boilers and chimneys could not be thrown overboard, without the greatest risk, when there was any considerable sea. To require delay until a storm, would be, in effect, to prohibit the sacrifice."

■ It is argued on behalf of the cargo that there was no real risk. The master is quoted as testifying that "there was no immediate danger to ship or cargo," but he qualified this by saying that there was a danger "of opening up seams in the plating of the steamer"—a prognosis which

44

the survey showed was actually realized. Indeed, when a vessel is stranded she and her cargo are practically always in a substantial peril. Such a vessel is helpless because she cannot pursue her intended voyage or deal effectively with any emergency which may arise. If in the present case a storm or any other cause had further lowered the water in the Parana, the ship would have been likely to take a further list and to strain her plates. If she should sink deeper into the mud and come to rest on some hidden submerged rock or other obstruction, that also would subject her to a further strain. The uneven bottom on which, according to the testimony of the second officer, she was already resting, also made it imperative that she should get off the strand as soon as possible, not only in order to resume her voyage but to insure the safety of ship and cargo. Where a vessel is stranded and it cannot be certain how soon she can be moved, unusual expenditures incurred in attempting to get her off the strand are proper subjects of general average. Such we believe is the doctrine of the English decisions. Vlassopoulos v. British & Foreign Marine Insurance Co., Ltd., (1929) 1 K.B. 187, 199; Charter Shipping Co. v. Bowring Jones & Tidy, 36 Ll.L.Rep. 272, 274, 275; The Bona, (1895) P. 125; and likewise of the American authorities: Aktieselskabet Fido v. Lloyd Braziliero (C.C.A.) 283 F. 62, 70, 71; The Leonie O. Louise, 4 F.(2d) 699 (C.C.A.5); The Pendragon Castle, 5 F.(2d) 56 (C.C.A.2); The Plymouth Rock (D.C.) 9 F. 413, 416; The Saragossa, Fed.Cas.No.12,334, 1 Ben. 551, 552.

■ In the present case we think the elements requisite to a general average act were established. There was the danger that the seams of the steamer's plating would open as was proved by the testimony of both the master and the mate and likewise by the heavy bottom damage actually sustained. There was the realization of that peril acknowledged in the master's testimony and manifested by the care with which he watched for rising water in the steamer's bilges. There was the intentional extraordinary use of the steamer's engine machinery to drive her over the bar into the deeper water and thereby at the earliest opportunity to free her from her position of peril, regardless of the risk of damage which such extraordinary use necessarily involved. These

things constituted the general average act and rendered the respondent liable to contribute its proportion of expenditures incurred for the common benefit of ship and cargo.

The claim of the respondent that large vessels were constantly stranding in the river, though readily released without damage or risk, is disputed, and seems to us without sufficient foundation. The notice to the Argentine government of the stranding of the Mincio resulted in an official investigation and the dispatching of an official from the harbor master's office. Such attention would hardly be given to an ordinary incident of frequent occurrence and no importance.

■ Inasmuch as a case for general average was established, the agreement to pay whatever the average adjusters found due to the shipowner ought to be enforced. The case is not like that of United States v. Atlantic Mutual Ins. Co., 298 U.S. 483, 56 S.Ct. 889, 891, 80 L.Ed. 1296, where there was no agreement to pay the amount found due by the average adjuster, so that Justice Van Devanter, who wrote the opinion of the court, remarked: "In the absence of some stipulation on the subject, and there was none, his function was only that of aiding or assisting the owner in gathering and stating data and making appropriate calculations as a suggested basis for an adjustment to be made by the owner, or under the owner's direction."

In the present case the lien of the ship upon the cargo to secure payment of its share in general average was released upon the agreement by the respondent: "that so much of the losses and expenses * * * as upon an adjustment of the same to be stated by Johnson & Higgins, Average Adjusters, according to the provisions of the contract of affreightment and to the laws and usages applicable, may be shown by the statement to be a charge upon said cargo, or to be due from us, shall be paid by us respectively, according to our ratable proportion thereof, to the owners of said vessel, or Johnson & Higgins, in and for settlement in accordance with said statement."

It is not necessary to say that the agreement contemplated a submission to the general average adjusters of the issue whether the case was one of general average. Cf. Corrado Societa Anonima Dinavagazione v. L. Mundet Sons, Inc. (D.

C.) 18 F.Supp. 37. We have, therefore, discussed the evidence bearing on that question and have found that the situation was such. We think that the agreement did contemplate the submission of the amount of the expenditures and what proportion of general average expenses should be borne by the cargo. Upon examination of the statement of the adjusters we find that the expenditures classed by them as general average expenses were proper ones. Nor do we find any attacks made upon the adjustment by the respondent other than certain claims that the case was not one for general average and that the vessel was unseaworthy. None of these general criticisms is borne out by the record. Accordingly we have a situation where a case for general average has been established, no successful attack has been made on any item allowed by the adjusters, and the respondent has agreed to pay the amount found due. So far as the items were proper charges in general average, and they seem to us such, the decision in Rebora v. British & Foreign Marine Ins. Co., 258 N.Y. 379, 180 N.E. 90, where the findings of the adjusters were held conclusive, is pertinent. The situation in no way resembles one in which there is no agreement to accept such findings. Accordingly there is due the libelant from the respondent $6,451.16, with interest from November 8, 1928, the date of the general average statement under which interest has been reckoned to that date. (See Exhibit 4, p. 23.)

As already intimated, the contention that the vessel was unseaworthy, based as it is on little more than speculation, ought not to prevail. Likwise we think that there was no breach of clause 3 of the charter due to failure to cross the bar. The clause was not an absolute guaranty to cross the bar safely, but only that the steamer should not be loaded with more than could reasonably be expected to be carried over the bar. The failure to pass was due to the wrong signal of the government semaphore rather than to any negligence in loading that rendered the vessel unseaworthy or caused a breach of clause 3 of the charter.

The decree is reversed, with costs, and a decree directed for the libelant and against the respondent for $6,451.16, together with interest from November 8, 1928.