EMPIRE STEVEDORING CO., Ltd.,
Plaintiff,

v.

OCEANIC ADJUSTERS, LTD., Arthur L. Liman, as Successor Trustee Under Chapter X of the Bankruptcy Act of A. H. Bull Steamship Co., as owner of the STEAMSHIP BEATRICE, Defendants.

No. 69 Civ. 3310.

United States District Court,
S. D. New York.

Sept. 2, 1970.

Foley, Grainger & Darby, New York City, for plaintiff by Joseph Grainger, and Robert P. Whelan, New York City, of counsel.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for defendants, by Stuart Robinowitz and Steven B. Rosenfeld, New York City, of counsel.

## OPINION

POLLACK, District Judge.

The parties have cross-moved for summary judgment. These motions present a novel and important question going to the interaction of the Bankruptcy Act with the maritime doctrine of general average. The question here resolved is whether a stevedore hired to aid a stricken ship is entitled to an equitable claim against the contributions made by cargo interests for general average purposes where the shipowner has become bankrupt. The general average adjuster appointed to hold the general average funds has not as yet distributed the funds received. We hold that the stevedore has no lien on the general average fund nor is it held in trust for it.

### I.

The following facts are undisputed:

On October 22, 1962, the S.S. BEATRICE, laden with cargo loaded at various Great Lakes ports, was steaming up the St. Lawrence Seaway when she surged in the wake of a passing steamer, struck a bridge abutment and sustained damage to her propeller. The vessel arrived at Montreal two days later and divers subsequently reported that the damage was serious. To save the ven-

ture the interested parties determined to make immediate repairs. The vessel had to be lightened to be placed on drydock for the required work. Plaintiff was engaged and handled the unloading of part of the vessel's cargo; subsequent to the completion of repairs, plaintiff also reloaded the cargo previously discharged.

A general average situation was declared by the master of the BEATRICE on behalf of Bull, and defendant Oceanic was designated as the adjuster. Oceanic then obtained the usual security from cargo interests (with the exception of sovereign governments, which were not obligated to give security) so the vessel could continue its voyage. On November 6, 1962, the BEATRICE steamed out of Montreal and she completed her voyage in due course.

Shortly after the incident, on March 19, 1963, Bull filed in this Court a petition under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 721. This proceeding was superseded on May 21, 1963, by the filing of a reorganization petition under Chapter X, 11 U.S.C. § 527. Plaintiff filed a proof of claim in the latter proceeding on August 27, 1963, asserting that Bull owed it the sum of $56,495.58 (Canadian Dollars) for stevedoring services rendered to the BEATRICE in October and November, 1962. Plaintiff asserted in its bankruptcy claim that it held as security for the debt, a maritime lien against the S.S. BEATRICE, her engines, boilers, etc.

On February 20, 1963, the BEATRICE was attached by the U. S. Marshal at Baltimore, Maryland pursuant to a libel in rem filed in the District Court of Maryland by a bank holder of a mortgage covering the ship. Numerous other libels were thereafter filed against the ship by other claimants. Although libeled on February 20, 1963, the BEATRICE was not sold by the Marshal until February 25, 1964, the delay being partly due to the pendency of the Chapter X proceedings in New York involving Bull, the owner of the ship.

The sale of the BEATRICE in the Maryland admiralty foreclosure proceedings yielded a price of $170,000. Costs of preservation and sale reduced these proceeds to a net of $96,073.17. However, this amount was augmented by $39,109.91 which was derived from an additional item, raising the total fund in the Maryland District Court up to $151,-500.

The plaintiff filed a libel for its maritime lien on the vessel in the Baltimore proceedings but failed thereafter to process its claim. The Maryland District Court entered an order in the foreclosure proceedings on December 2, 1964 which directed all claimants before it to object to the validity of the mortgage on the vessel or to assert priority over it, by January 11, 1965. The order further provided that for failure to comply with its directions, the libel of any claimant should be deemed dismissed without prejudice and such claimant should not be entitled to notice of further proceedings in the suit. The plaintiff failed to comply with this order and its claim to a lien was accordingly dismissed. The maritime lien claimants, who complied with the order, participated in the distribution of the proceeds of the sale of the vessel under a settlement formula arrived among them.

On March 22, 1968, this Court terminated the Chapter XI and Chapter X proceedings and adjudicated Bull and seven consolidated debtors bankrupts. On May 6, 1968, defendant Liman qualified as trustee in bankruptcy for the eight.

On October 31, 1968, plaintiff sought to collect on its claim by commencing action in this Court, 68 Civ. 1295, against the United States seeking direct recovery of general average contributions due from the government as a shipper of goods on the BEATRICE.

Subsequently, on February 12, 1969, Oceanic issued a statement of general average regarding the 1962 BEATRICE incident. The statement was premised, according to Oceanic, on a provision contained in all the relevant bills of lading

which made general average "payable in accordance with the York-Antwerp Rule 1950 and as to matters not therein provided for in accordance with the laws and customs of the port of New York." *Inter alia,* the statement concluded that Empire's stevedoring services were properly chargeable to the general average and that a sum of $52,477.74 (the American Dollar equivalent computed by Oceanic of $56,495.58 in Canadian Dollars) for these services remained unpaid.

Shortly thereafter, on February 28, 1969, Empire again invoked the assistance of this Court, this time moving to intervene in a pending action, 64 Ad. 1124, which had been commenced by defendant Liman's predecessors, the Chapter X trustees, against the United States to recover general average contributions due the owner of the BEATRICE from the government. On May 5, 1969, Judge Bonsal dismissed Empire's complaint in 68 Civ. 1295 and denied the motion to intervene in 64 Ad. 1124. The complaint was dismissed as time-barred by the two-year statute of limitations under the Suits in Admiralty Act, 46 U.S.C. § 745. The motion to intervene was denied on the grounds that a direct action against the government was time-barred and that plaintiff's interests as a creditor of Bull were being adequately vindicated by Bull's trustee in bankrupcty. Re-argument on the motion to intervene was denied on June 17, 1969.

In its motion for summary judgment, plaintiff argues that a general average fund is a form of trust created to pay the general average expenditures. The shipowner and adjuster are, plaintiff urges, merely trustees who are obligated to pay those who aided the ship in connection with the general average situation. Plaintiff says that since the shipowner made no contribution in general average, it is not a creditor of the cargo interests. The duty of the cargo interests, plaintiff maintains, is to pay into the fund, not to pay the shipowner. Furthermore that property held by a bankrupt in trust for another is clearly property to which a bankrupt's creditors

have no claim. It follows, plaintiff asserts, that its claim to the fund is superior to that of the shipowner's trustee in bankruptcy.

Plaintiff insists that at the very least it is entitled to so much of the general average fund as represents the sum which cargo interests are obliged to contribute in respect of Empire's stevedoring services. Plaintiff reasons that cargo interests are required to pay about 80 percent of the total due for stevedoring services rendered and prays the Court for summary judgment in the sum of 80 percent of the total of $52,477.74 owed it, or about $40,000. Plaintiff additionally argues that its filing of a bankruptcy claim against the shipowner is by no means inconsistent with this suit, because even assuming plaintiff's success herein, the shipowner will still owe plaintiff the remaining 20 percent of the total due from the ship and freight interests. Plaintiff also asserts that its position is warranted by a strong policy consideration; *viz.,* cargo underwriters may not be obliged to pay their assureds' portions of general average expenses if the money goes to a bankrupt shipowner's general creditors and not to compensate those who rendered services.

Defendant Liman, in his cross-motion for summary judgment, argues that Empire is merely a general unsecured creditor of the bankrupt Bull, and as such is not entitled to priority over other general creditors. Defendant maintains that the fact that Empire's efforts contributed to the creation of a specific fund or a right of action by the bankrupt against a third party is irrelevant; such circumstances do not give rise to an equitable lien or constructive trust in favor of one creditor as against all other creditors. Defendant further asserts that nothing in the law of general average gives Empire an equitable, security or other protected interest in general average contributions. The law of general average, defendant insists, relates solely to dealings between a shipowner and car-

go interests who embark on a common maritime venture and who are united by one or more contracts of affreightment; it is not concerned with third parties like Empire who are strangers to the common adventure. Defendant urges that the liability of cargo interests in general average is to reimburse shipowners who incurred expenses on their behalf and not to pay those who did the work necessary to enable the ship to proceed on her voyage. Defendant finally asserts that plaintiff's action must be dismissed on the ground of *res judicata,* in that precisely the claims here advanced were rejected in Empire's application to intervene in the trustee's action for general average contributions against the government.

## II.

It is fundamental that "the theme of the Bankruptcy Act is equality of distribution," and that general creditors are entitled to no greater rights than other general creditors of the same class. Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941). However, the Bankruptcy Act does not provide for equality of distribution under all circumstances. Although there is some question as to whether a bankruptcy court or an admiralty court is the proper forum, it is nevertheless clear that a valid maritime lien will be enforced against a ship which is the asset of a bankrupt shipowner (or one in reorganization). The Robert & Edwin, 32 F.2d 390 ( D.Mass.1929); West Kentucky Coal Co. v. Dillman, 15 F.2d 25 (8th Cir. 1926); In re New York, N.H. & H.R. Co., 17 F.Supp. 488 (D.Conn.1936); In re Martin, 78 F. Supp. 433 (E.D.N.Y.1948). See generally, G. Gilmore & C. Black, The Law of Admiralty § 9–92, at 656–659 (1957). Had plaintiff but responded to the 1964 order of the Maryland District Court, there is every reason to believe that its maritime lien for stevedoring services would have been honored. See, 46 U.S.C. §§ 953(a) (2) and 953(b) (1), and Gilmore & Black, *supra,* § 9–68 at 610–612,

as to the preferred status of maritime liens for stevedoring over mortgage liens.

Another occasion where the status of one claimant is preferred over that of general creditors is where the bankrupt holds property in trust for the claimant, Todd v. Pettit, 108 F.2d 139 (5th Cir. 1939); In re German, 193 F.Supp. 948, 953 (S.D.Ill.1961); *cf.* Frederick v. Baxter Arms Corp., 107 F.2d 732 (2d Cir. 1939), or, indeed, where a Court determines that a constructive trust in the claimant's favor must on equitable grounds be impressed on property in the hands of a bankrupt. Pacific Indem. Co. v. Grand Ave. State Bank of Dallas, 223 F.2d 513 (5th Cir. 1955); In re Prudence Bonds Corp., 79 F.2d 212 (2d Cir. 1935). However, the mere fact that plaintiff's efforts contributed to the creation of a specific fund or a right of action by the bankrupt against a third party does not give rise to such a constructive trust. Cherno v. Dutch American Mercantile Corp., 353 F.2d 147 (2d Cir. 1965); Donald W. Bower, Inc. v. Frank, 95 U.S.App. 77, 219 F.2d 509 (1955); Arkwright Mutual Insurance Co. v. Bargain City, U.S.A., Inc., 251 F. Supp. 221 (E.D.Pa.1966), aff'd, 373 F.2d 701 (3d Cir.), cert. denied, 389 U.S. 825, 88 S.Ct. 63, 19 L.Ed.2d 79 (1967).

A constructive trust is one arising by operation of law or by construction of equity in order to satisfy the demands of justice, as distinguished from an express trust or one impliedly created by any words. 89 C.J.S. Trusts § 15 (1955); 54 Am.Jur. Trusts § 218 (1945). It is said to arise contrary to intention against one, usually clothed with some fiduciary character, who by fraud, duress, abuse of confidence, commission of wrong or by any form of unconscionable conduct holds legal title to property which he ought not to hold in equity and good conscience. The device is also described as an appropriate remedy against unjust enrichment, where even though property is not originally acquired by inequitable conduct, it is against equity that it should be retained by the person holding it.

*Id.* Scott has offered the following statement of when a constructive trust arises:

> A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. When a person holds the title to property which he is under an obligation to convey to another, and when that obligation does not arise merely because he has voluntarily assumed it, he is said to hold the property on a constructive trust for the other and he is called a constructive trustee of the property. He is not compelled to convey the property because he is a constructive trustee; it is because he can be compelled to convey it that he is a constructive trustee. 5 A. Scott, The Law of Trusts § 462, at 3413 (3d ed. 1967).

The question then remains whether defendant Liman is subject to an equitable duty to convey to Empire so much of the general average fund as the cargo interests are obliged to contribute thereto in respect of Empire's stevedoring services on the ground that otherwise Bull's general creditors would ultimately be unjustly enriched if Bull's successor, the trustee in bankruptcy, were permitted to retain the sum.

In answering this question, it must initially be observed that there is nothing inherent in the kind of services performed by Empire which would make it inequitable to treat its claim therefor equally with other claims by Bull's unsecured creditors. As noted above, admiralty has long recognized that a claim for stevedoring services gives rise to a maritime lien against a vessel. Here, however, Empire relinquished its lien by failing to respond to a court directive. The policy of the Bankruptcy Act is averse to recognizing any preference on account of a lien where available means of executing the lien have not been employed. *Cf.* Bankruptcy Act § 60(a) (6), 11 U.S.C. § 96(a) (6); Cherno v. Dutch American Mercantile Corp., *supra;* Donald W. Bower, Inc. v. Frank, *supra.*

Secondly, it is reasonably clear that Empire's claim for stevedoring services is a valid general average expense. The charter parties and bills of lading employed in connection with the 1962 voyage of the S.S. BEATRICE incorporated by reference, and hence, made binding as a matter of contract, the York-Antwerp Rules of 1950 (the third version of rules originally drafted in 1890 by a Conference of the Association for the Reform and Codification of the Law of Nations). See, G. Gilmore & C. Black, The Law of Admiralty § 5–5, at 228–29 (1957). This prestigious body of rules, which is generally adverted to in current law and practice relating to the adjustment of general average, provides in relevant part in Rule X(b) that

> The cost of \* \* \* discharging cargo \* \* \* at a port or place of loading, call or refuge, shall be admitted as general average when the \* \* \* discharging was necessary \* \* \* to enable damage to the ship caused by \* \* \* accident to be repaired, if the repairs were necessary for the safe prosecution of the voyage.

R. Lowndes & G. Rudolph, The Law of General Average § 669, at 335 (9th ed. 1964) in 7 British Shipping Laws (1964) (hereafter, "Lowndes & Rudolph").

Rule X(c) further provides that, "Whenever the cost of \* \* \* discharging cargo \* \* \* is admissible as general average, the cost of reloading and stowing such cargo \* \* \* on board the ship \* \* \* shall likewise be so admitted." *Id.,* § 674, at 338. The practice of treating the cost of discharge as a general average expense where cargo is discharged to enable the ship to be repaired has been called "inveterate", Lowndes & Rudolph, § 302 at 17k, and is firmly rooted in Anglo-American case law. See, Svendsen v. Wallace, [1884] 13 Q.B.D. at 87; Aktieselskabet Cuzco v. The Sucarseco, 294 U.S. 394, 398, 401, 55 S.Ct. 467, 79 L.Ed. 942 (1935). However, labelling the obligation as an expense does not invoke trust doctrine for its satisfaction.

Thirdly, it must be pointed out that the mere listing of Empire's claim in the general average statement prepared by Oceanic would not *ipso facto* give rise to a constructive trust for that amount, or for any portion thereof, in Empire's favor. A general average adjuster acts as an agent of the shipowner in preparing the adjustment in general average embodied in a general average statement. See Gilmore & Black, § 5–3, at 224–26. The profession is said to enjoy "a very high reputation for fairness to ship and cargo alike." *Id.*, at 225. Yet, an adjuster is not an arbitrator and his statement is not an "account stated"; rather, it is "a provisional estimate and calculation which his principal, the owner, [is] free to adopt or to put aside." United States v. Atlantic Mut. Ins. Co., 298 U.S. 483, 491, 56 S.Ct. 889, 891, 80 L.Ed. 1296 (1936). The Supreme Court has described the adjuster's function, absent any stipulation, as "that of aiding or assisting the owner in gathering and stating data and making appropriate calculations as a suggested basis for an adjustment to be made by the owner, or under the owner's direction." *Id.*

Absent any agreement to the contrary, a general average statement prepared by a professional average adjuster is without any legal effect whatsoever and is open to question in every particular. *Id.* The effect of agreements to pay expenses upon an adjustment, according to the provisions of the contract of affreightment and applicable laws and usages, is not clear. *Compare* Corrado Societa Anonima Di Navagazione v. L. Mundet Sons, 18 F.Supp. 37 (E.D.Pa.1936), aff'd, 91 F.2d 726 (3d Cir. 1937), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 581 (1937), *with* Navigazione Generale Italiana v. Spencer Kellogg & Sons, 92 F.2d 41 (2d Cir.), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937); *see* Gilmore & Black, § 5–4, at 227–228. It has recently been held that such agreements render the statement *prima facie* proof of the fact that expenses were the consequence of a general average act and of the amount of the expenses, CIA.

Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., 274 F.Supp. 884, 898 (D.Md.1967). However, all the authorities agree that the statement is not conclusive on the question of whether cargo interests are liable at all in general average. Corrado Societa Anonima Di Navagazione v. L. Mundet Sons, *supra;* Navigazione Generale Italiana v. Spencer Kellogg & Sons, *supra;* CIA. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., *supra.* Nothing in the case authorities indicates the existence of a duty to hold a portion of the fund in trust for one named in the statement.

The law of general average, which derives from ancient usage dating back at least to the Rhodian law and to which all the principal maritime nations subscribe, rests on the principle that loss or expenditures incurred by one who partakes in a maritime venture for the benefit of all should be shared ratably by all who participate in the venture. *See generally*, Lowndes & Rudolph, at 3–25; Gilmore & Black, § 5–1, at 220–23; Barnard v. Adams, 51 U.S. 270, 303, 10 How. 270, 13 L.Ed. 417 (1850). The right to general average has been said to rest both on an implied contract between the parties to the common adventure and upon the established law of the sea. Ralli v. Troop, 157 U.S. 386, 397, 15 S.Ct. 657, 39 L.Ed. 742 (1895). General average is conceived as a "measure of justice for a meritorious service, to distribute among all who were benefited [by the sacrifice or the incurring of extraordinary expenses] a due proportion of what was sacrificed or expended." Hobson v. Lord, 92 U.S. 397, 409, 23 L.Ed. 613 (1876).

The device was clearly conceived as one to equitably distribute extraordinary sacrifices and expenses among the partners to a common maritime adventure. It has been recognized, moreover, that in general average the interests of strangers to a maritime adventure "neither contribute nor are contributed for". Ralli v. Troop, 157 U.S. at 411, 15 S.Ct. at 667 (1895). An English case touching tangentially on the problem here pos-

ed, noted that "Crews' wages, pilotage fees and the cost of feeding the crew are no doubt primarily ship's liability and it does not seem possible to assert that all the interests concerned are directly liable to pay the crew or pilot once a general average act has been done and general average expenditure is incurred." Morrison Steamship Co., Ltd. v. Greystoke Castle, [1947] A.C. 265, at 294. Lord Porter, writing for the House of Lords majority, noted further that the cargo owners' "liability was to reimburse the owners of the *Greystoke Castle* who incurred the expense on their behalf and not to pay those who did the work necessary to enable that ship to proceed on her voyage." *Id.*, at 295. And that Court, in rejecting the contention that claims against outsiders for damage to an adventure as a whole be considered in fixing contributory values, noted:

> The law of general average, when the contingency arises on which it can properly be invoked, is the partnership law of the adventure, and concerns itself, not with the claims for damage to the adventure by outsiders, but wholly with the equitable adjustment, under its rules, of the rights and liabilities inter sese of the partners to the adventure. It governs the domestic relations of the adventure, and to import into it, for any purpose, claims against outsiders would be not only to distort it, but to involve it in such practical difficulties as would make the boldest adjuster tremble. The Andree, 41 F.2d 812, 816–817 (S.D.N.Y.1930), rev'd on other grounds, 47 F.2d 874 (2d Cir. 1931).

So, in the instant case, it might be said that the law of general average, the partnership law of the adventure, does not concern itself with claims that the shipowner who incurred debts for the benefit of the common adventure defaulted in payment on those debts. Any fiduciary relationship arising out of the law of general average runs solely in favor of the ship, freight and cargo interests, respectively. Those who render services which are treated as general average expenditures are not the intended beneficiaries.

Moreover, in the ordinary case, the stevedore who performs services in a general average situation looks for payment exclusively to the shipowner who contracted for the services. If cargo interests owing a net contribution to the average fund become insolvent, the shipowner is in no measure relieved of his obligation to pay in full for the contracted stevedoring. It would be anomalous, therefore, that one sharing none of the risks or obligations of the relationship should reap a benefit therefrom in the rare case where the shipowner becomes insolvent.

Empire, as a creditor, will ultimately share the proceeds from the general average fund ratably with the other unsecured creditors.

In view of the Court's determination of the principal issue, the *res judicata* question need not be considered.

Plaintiff's motion for summary judgment is, accordingly, in all respects, denied. Defendant Liman's cross-motion for summary judgment dismissing the complaint is granted and the complaint is hereby dismissed.

So ordered.