**ALASKA NATIVE INDUSTRIES COOP-
ERATIVE ASSOCIATION, Elim Native
Store, Koyuk Native Store, Gambell
Native Store, Stebbins Native Store, Sa-
voonga Native Store, Libelants,**

v.

**UNITED STATES of America,
Respondent.**

**No. 16522.**

United States District Court
W. D. Washington, N. D.
March 27, 1962.

Summers, Bucey & Howard, Seattle, Wash., for libelants.

Brockman Adams, U. S. Atty., Seattle, Wash., Douglas M. Fryer, Attorney Admiralty & Shipping Section, Dept. of Justice, Seattle, Wash., Keith R. Ferguson, Special Asst. to the Atty. Gen., Dept. of Justice, San Francisco, Cal., for respondent.

BEEKS, District Judge.

This case has been instituted under the Suits in Admiralty Act and/or Public Vessels Act for the purpose of recovering damages to cargo delivered to and accepted by the vessel in good order and condition and out-turned in damaged condition, the damage thereto having been caused by water.

The only matter before me at this time is the question of liability.

The vessel involved, the MV NORTH STAR, a "CMAVI" type of vessel, was owned by the United States of America and operated by the Bureau of Indian Affairs, an agency of the Department of the Interior.

On the voyage in question (voyage No. 70), the Government operated the NORTH STAR between Seattle and various ports in Alaska, ranging from Southeastern Alaska to the Bering Sea, principally for the purpose of supplying various Indian, Aleut and Eskimo villages.

The NORTH STAR is one of a series of vessels that have been used by the Bureau of Indian Affairs to supply some 75–80 stations in Alaska ranging from Southeastern Alaska to Point Barrow in the Arctic Ocean, and the primary purpose of the vessel is to carry supplies and cargo to approximately 50–60 ports which, with several exceptions, are not served by regular commercial carriers.

It is the general policy of the Bureau of Indian Affairs not to compete with commercial carriers with respect to cargo not owned by the Government.

Cargo was accepted by the Government in the following priority: (1) Bureau of Indian Affairs, (2) Alaska natives, including the libelant, and (3) other Government agencies. Included in the third category are teachers, missionaries and a private trader who trades with the natives. Thus, if the cargo capacity of the NORTH STAR is exhausted by any category having priority, those categories of inferior priority would be denied space.

A prospective shipper falling within the second priority classification writes a letter to the Bureau outlining the merchandise such shipper proposes to ship, together with particulars as to weight and cube, and if accepted the Bureau issues a permit to the shipper in which the shipper is advised of the conditions under which the merchandise will be accepted. One of the conditions of which the shipper is notified, and which is also incorporated in an agency regulation as well as a tariff issued by the Bureau, denominated Tariff No. 2, is an exculpa-

tory provision providing, in substance, that the cargo will be accepted only on the condition that the Government will not be held responsible for any loss, damage or non-delivery. Shippers are further advised that the freight rates charged do not include marine insurance and that they can protect themselves against loss by obtaining their own insurance.

The cargo of libelants was so accepted by the Bureau and on the voyage in question it was loaded on board the NORTH STAR in good order and condition and stowed in the No. 2 lower hold of the vessel.

The loading of the vessel for Voyage 70 was planned by the chief mate who made up a stowage plan and loaded the cargo to the vessel in the inverse order of the scheduled ports of call. In other words, the first in would be the last out. After the loading was completed at Seattle, the vessel proceeded to Point Wells for bunkers and after bunkering in all available fuel oil tanks the vessel at the time of departure from Point Wells on April 22, 1958, had a draft of 22 feet 11 inches forward and 20 feet aft. She was down two feet 11 inches by the head. At the time of departure from Point Wells, the vessel had a deckload consisting principally of lumber which was approximately 12 feet in heighth, the heighth being one to two feet higher than usual.

While at Point Wells the Vessel loaded two self-propelled landing craft type vessels, called M-Boats. They were lifted by use of the jumbo boom trimmed at a 45 degree angle and they were stowed on top of the deckload at No. 2 hatch. The M-boats are used as lighters for the purpose of discharging cargo at various ports of call. During the loading of the M-boats the master noted the NORTH STAR to be tender in that the vessel listed eight degrees at the time the first M-boat was lifted and 12 degrees at the time the second M-boat was lifted. Thereafter the vessel discharged cargo at Hydaburg, Tatitlek, Chenega, Seward,

Port Graham, Tyonek, Anchorage Bay, Castle Bay and Chignik. While loading one of the M-boats at Chignik in a flat sea, the master noted that the NORTH STAR listed 14 degrees and thereafter righted herself. The draft of the vessel at Chignik was 19 feet 11 inches forward and 18 feet 11 inches aft. The consumption of fuel oil and water during the period following the departure of the vessel from Point Wells until arrival at Chignik, coupled with the discharge of cargo at the various ports named, had the effect of decreasing her draft and changing her metacentric heighth, with the result that during the course of the voyage she became increasingly more tender and unstable.

After leaving Chignik for Perryville, the vessel encountered what the master described as a large southeast swell, causing the vessel to take extremely heavy rolls. She was a long time righting herself and the master becoming concerned over the possible loss of the M-boats and the deckload returned and anchored in Castle Bay until the swell subsided. The log book for this period is somewhat at variance with the master's testimony as to the sea in that it indicates a "choppy WNW sea" and a wind from the same direction of Force 6. The vessel thereafter proceeded to Perryville and Akutan for the further discharge of cargo.

By the time the discharge of cargo was completed at Akutan, the master determined that there was sufficient space in the No. 2 tween deck to enable him to restow some of the deck cargo under deck and thereby increase the stability of the vessel, and he proceeded to Dutch Harbor and made fast portside to the Ballyhoo Dock at 1620, May 10th. The M-boats were discharged and the crew proceeded to shift lumber from the deckload into No. 2 hatch. It was raining hard and blowing heavily during all of the time the cargo was being transferred and by 2030 the crew was unable to work because of gale winds. The transfer of the deckload was resumed at 0800 May 11th, and completed by 1830, at

which time the vessel had a draft of 19 feet 8 inches forward and 19 feet aft.

There is no evidence indicating that the transfer of the cargo had to be made under the conditions of weather existing at the time. A hatch tent was not used over No. 2 hatch at the time of the transfer, although a hatch tent could probably not have been used under the conditions of weather at the time the transfer of the cargo was actually effected. Furthermore, there is no evidence that the vessel was equipped with hatch tents.

As indicated before, the cargo damage, which is the subject of this suit, resulted from contact with water.

During the course of the transfer of the deckload to the No. 2 tween deck at Dutch Harbor, rain and wind-blown sea entered the No. 2 hatch opening. Furthermore, the deckload transferred to No. 2 tween deck was wet and substantial quantities of water trapped in the stow escaped and ran down into the No. 2 tween deck.

While there and following departure from Dutch Harbor, the vessel still trimmed by the head. The only scuppers in the No. 2 tween deck area were located in the after part of the hatch with the result that the natural flow of water on the No. 2 tween deck would be forward where it could not escape, and inasmuch as the hatch coaming at the No. 2 tween deck was only 1¼ inches in heighth, movement of the vessel would tend to cause the water to slop over the hatch coaming and leak into the No. 2 lower hold.

At Nikolski on or about May 12th, it was noted that there was water damage to cargo stowed around the periphery of No. 2 hatch, in the forepart of the lower hold, and down the after part of the lower hold, this last damage being of a vertical conical shape.

On or about July 9, 1958, the master found a ruptured steam line strainer in the No. 2 tween deck, which the Court finds was ruptured as a result of freezing. There is no evidence in the record of freezing temperatures during the course of Voyage 70 up to and including the time the ruptured valve was discovered, and the Court finds that such ruptured valve existed prior to the time the vessel left Seattle on Voyage 70. The Court further finds that steam condensate could have escaped through the ruptured strainer, although the testimony is at variance with respect to the quantity of water that may have escaped. The chief engineer has testified that it was the usual practice to remove a short section of pipe from both the supply and return lines and to cap the ends of the pipe remaining at the end of each season, and then to replace the removed sections of pipe in the fall of the following season immediately prior to embarking natives at Nome for transportation to King Island; that the purpose of the steam line in question was to provide heat in the No. 2 tween deck for such transportation of natives and that the steam lines were only in use for approximately one week each year. Mr. Skewes, a marine surveyor, examined the vessel on August 7, 1958, at Seattle, a substantial time prior to the 1958 King Island trip, and there were no sections of the pipe missing from the steam lines at that time. The Court accepts the testimony of Mr. Skewes and this testimony, coupled with the log entry made by the chief engineer to the effect that the master reported a leak in the steam heating coils in No. 2 cargo hold, convinces the Court that there was some leakage during the course of Voyage 70 from the ruptured strainer which contributed to the damage to the cargo.

By way of summary, the Court finds that the damage to libelants' cargo was proximately caused by water emanating from four different sources:

1. From the ruptured strainer valve located in the after end of No. 2 tween deck.

2. From rainwater falling into the hatch opening during transfer of cargo at Dutch Harbor.

3. From sea-blown salt water spray blown into the No. 2 hatch opening dur-

ing the transfer of cargo at Dutch Harbor.

4. From the wet lumber which had been stowed on deck at the time of its transfer into No. 2 tween deck at Dutch Harbor.

■ In many respects the use and operation of the NORTH STAR was of a public nature and the commercial aspect only incidental to the main purpose. It is quite probable that Congress could clothe the entire operation with immunity but it has not done so. There is no doubt that the NORTH STAR was used as a merchant vessel in that she transported cargo which was privately owned and the controlling statute, insofar as the rights and liabilities of the Government are concerned, is the suits in Admiralty Act whereby rights and liabilities of the Government are the same as if the vessel were privately owned or operated. The Court is satisfied that the vessel insofar as the present libelants are concerned was operated as a common carrier with all of the rights and obligations of a privately owned and operated commercial vessel.

■ This being so, the Court finds that the exculpatory regulation/tariff provision was invalid and ineffective insofar as it attempted to relieve the Government from liability for loss or damage arising from negligence or fault in the proper loading, stowing or carrying of libelants' cargo, and insofar as it attempted to relieve the Government from the exercise of diligence in making the vessel seaworthy.

■■ What then are the obligations of the Government with respect to the libelants? The Court conceives them to be as follows:

1. The Government is liable for damage to libelants' cargo proximately resulting from unseaworthiness existing at the commencement of the voyage, irrespective of whether the Government used due diligence to make the vessel seaworthy.

2. The Government is liable for damage to libelants' cargo proximately re-

sulting from neglect in the care and custody of the cargo.

3. The Government is not liable for damage to libelants' cargo proximately resulting from faults or errors in navigation or in the management of the vessel if the Government affirmatively establishes that it has exercised due diligence to make the vessel seaworthy in all respects. Conversely, if the Government fails to establish that it has exercised due diligence to make the vessel seaworthy in all respects, it shall be liable for damage to libelants' cargo proximately resulting from faults and errors in navigation or in the management of the vessel, and this is true even if there be no causal connection between the loss and the unseaworthiness with respect to which due diligence was not exercised.

It is the position of the Government, as the Court understands it, that the quantity of water which could have escaped from the ruptured valve could not have exceeded fifteen gallons (the testimony of the chief engineer) and that it was of no consequence; that the water entering the hatch opening during the transfer of cargo at Dutch Harbor was the result of an error in management for which the Government is excused under Section 3 of the Harter Act, 46 U.S. C.A. § 192.

■ The Court disagrees. The method of operation of the NORTH STAR followed by the Bureau of Indian Affairs, as outlined in this case, was probably the most economical and expedient method of handling the transportation of cargo to the distant sparsely settled communities served, particularly in view of the shortness of the season in which such transportation can be accomplished. The method followed, however, does not satisfy the legal obligations of the Government as a common carrier. The proper stowage of cargo is a part of a vessel's seaworthiness and the Court finds that the vessel was unseaworthy as to its cargo at the time of the commencement of Voyage 70. At and prior to the time of the commencement of the voyage, the master knew

that the vessel was loaded in such a manner as made her tender. He also knew, or should have known, that this condition of stability would worsen as the voyage progressed and as the vessel lightened due to the consumption of fuel oil, water and the discharge of underdeck cargo. He knew, or should have known, that he would encounter wind and sea of the character that he did encounter and that he might have to do exactly that which he did at Dutch Harbor. If especially bad weather is to be reasonably anticipated, as I hold it was to be in this case, the standard of seaworthiness required is correspondingly higher. If an improperly loaded vessel gets into difficulty because of her improper loading, the fact of improper loading is decisive as to her unseaworthiness.

 The Court is of the opinion that all of the water damage sustained by libelants proximately resulted from the unseaworthiness of the vessel as to her cargo in the particulars stated, as well as the further additional causes. The trim of the vessel by the head rendered the scuppers inoperative and steam condensate emanated from the ruptured valve, which the Court further finds could have been discovered by the use of due diligence prior to the commencement of the voyage. Furthermore, a vessel operating in an area where heavy rain is reasonably to be expected during discharge of cargo which is not equipped with hatch tents to protect the cargo during such discharge, is unseaworthy as to her cargo.

The Court having found that the damage proximately resulted from unseaworthiness and that the respondent did not use due diligence in all respects to provide a seaworthy vessel, the exemptions from liability afforded the respondent under Section 3 of the Harter Act are inapplicable.

The Court has no intention of impugning the ability or seamanship of the vessel's master. The Court found his testimony honest and forthright.

The Court further believes him to be an able, competent master who did the very best he could under the plan of operation followed by the Bureau. The quantity and type of the cargo planned for Voyage 70 was simply greater than the vessel could reasonably have been expected to transport without fear of damage under conditions of wind and sea reasonably to have been anticipated. I suppose the only alternative would have been to provide an additional or a larger vessel, and while there is no evidence indicating why the NORTH STAR in use on Voyage 70 has been replaced this year, the need for a larger vessel may very well have been the reason. The Court believes that the master's decision to transfer the cargo at Dutch Harbor was in the exercise of sound judgment for the safety of the venture as a whole, but the action which he did take was one which should reasonably have been anticipated at and prior to the commencement of the voyage.

By way of conclusion, I might say that while I disagree with the Government's contention that the transportation undertakings in this case were contracts of private carriage, the end result would have been the same had the Court found such contracts to be those of private carriage.

 While the Court has no doubt that a private carrier may negate the warranty of seaworthiness implied in such an undertaking and absolve itself from liability for damage resulting from unseaworthiness or from negligence, the carrier must do so by clear and unequivocal language, which I find was not done in this case.

I might also add that the natural inference to be drawn from the provision in respondent's tariff No. 2 is that a shipper may protect himself by procuring a policy of marine insurance for all loss or damage which may occur during the course of a sea voyage, but such is not the case. There are many types of damage, such as theft and handling damage, which are not covered by the usual

and customary type of marine insurance policy.

Findings may be presented on April 9 1962, at 10 o'clock A.M., and the parties need not appear on March 30, 1962.