## SHAVER TRANSPORTATION COMPANY and Weyerhaeuser Company, Plaintiffs,

v.

## The TRAVELERS INDEMNITY COMPANY, Defendant.

### No. 78–556.

United States District Court, D. Oregon.

Dec. 27, 1979.

---

Alex L. Parks, of White, Sutherland, Parks & Allen, Portland, Or., Robert A. Dowdy, Law Dept., Weyerhaeuser Co., Tacoma, Wash., for plaintiffs.

Kenneth E. Roberts, Sr., of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for defendant.

SKOPIL, Circuit Judge, Sitting by Designation:

This is an action to recover on a marine cargo policy issued by the defendant, The Travelers Indemnity Company (Travelers). The subject matter of marine insurance claims is "maritime" and within the admiralty jurisdiction of the federal courts. 28 U.S.C. § 1333; *Jeffcott v. Aetna Insurance Company*, 129 F.2d 582 (2nd Cir. 1942), cert. denied 317 U.S. 663, 63 S.Ct. 64, 87 L.Ed. 533 (1942).

## FACTS

Shaver Transportation Company (Shaver), a barge company, contracted with Weyerhaeuser Company (Weyerhaeuser) to transport caustic soda from Weyerhaeuser plants to a buyer of the soda, GATX. Following the terms of the agreement, Shaver arranged for marine cargo insurance with Travelers. Several different "coverages" were discussed. Shaver decided on Free from Particular Average and "standard perils" provisions supplemented with "specially to cover" clauses.

Shaver loaded the first shipment of caustic soda on one of its barges and transported it to the consignee, GATX. GATX refused delivery. The soda had been contaminated with tallow. It was unfit for GATX's purposes. The parties agree that contamination occurred as Shaver was loading the caustic soda aboard the barge. The barge had previously carried a load of tallow, and Shaver had not thoroughly cleaned the barge input lines.

The barge was returned to Shaver's dock. The cargo was heated to prevent the caustic soda from solidifying. A report of the contaminated cargo was made to the defendant through its insurance brokers, Johnson and Higgins (J & H). Shortly thereafter J & H notified Shaver that the contamination did not represent a recoverable loss under the defendant's marine open cargo policy.

Shaver continued to store the soda on board the barge. Shaver investigated possible on-shore storage facilities and finally contracted with a chemical salvage company for removal of the liquid. Because of

the caustic nature of the cargo, Shaver incurred expenses in storage, including the cost of heating the soda and repair to corroded boilers and pipes. Weyerhaeuser lost the value of the shipment, offset partially by the salvage value. Shaver and Weyerhaeuser notified Travelers that they claimed under the marine cargo insurance policy and tendered abandonment of the cargo to Travelers. Travelers refused the tender and denied liability under the policy.

## ISSUES

Although the plaintiffs request recovery under several theories, there is only one major issue in the case:

Are the losses incurred by the plaintiffs the consequences of an insured event under the marine cargo insurance policy?

If the losses are not insured against, no recovery is possible. If coverage is afforded, I must determine which expenses are covered under the policy. Plaintiffs have meticulously examined the policy and argue for recovery under several theories.

## THEORIES OF RECOVERY

I. *Recovery under Perils of the Sea clause and Free from Particular Average clause*

█ The Perils clause,[1] almost identical to ancient perils provisions dating back several hundred years, defines the risks protected by the policy. *U. S. National Bank of Galveston v. Maryland National Insurance Company*, 218 F.Supp. 247, 248–49 (S.D.Tex.1963). In addition to a long list of "perils of the sea", the clause concludes with "and all other perils, losses, and misfortunes, that have or shall, come to the

hurt, detriment, or damage to the said goods and merchandise". Plaintiff argues that the "forced" disposition of the caustic soda was like jettison (an enumerated peril) and is covered by the concluding language of the clause. That language has been interpreted to include only perils that are similar to the enumerated perils. *Feinberg v. Insurance Company of North America*, 260 F.2d 523, 527 (1st Cir. 1958); *Commercial Trading Company v. Hartford Fire Insurance Company*, 466 F.2d 1239, 1245 (5th Cir. 1972).

Whether or not I conclude the forced disposition was a type of jettison, plaintiffs are unable to show an insurable loss due to jettison. The loss—contamination of the cargo—occurred at the time of loading. The disposition of the cargo caused no loss to plaintiffs but rather an offset against previous losses. Plaintiffs cannot recover under the Perils clause of the policy.

The term "jettison" also appears in the Free from Particular Average clause.[2] If jettison did occur, this clause affords coverage regardless of the amount of cargo damage. However, I find that a jettison did not occur in this instance. Jettison is the act of throwing overboard from a vessel a part of the cargo, in case of extreme danger, to lighten the ship.[3] The orderly unloading and sale of the cargo to a chemical salvage company is not "jettison". Plaintiff cannot recover under the Free from Particular Average clause.

II. *Recovery under Warehouse-to-Warehouse clause; Marine Extension clause; Shore Coverage clause*

█ These clauses augment the Perils clause by defining the scope of the coverage

---

1. (Clause 39) "Touching the adventures and perils which the said Assurers are contented to bear, and take upon themselves, they are of the seas and inland waters, man of war, fires, enemies, pirates, rovers, assailing thieves, jettisons, letters of mart and countermart, reprisals, taking at sea, arrests, restraints and detainments of all kings, princes of people of what nation, condition or quality soever, barratry of the master and mariners, and all other perils, losses and misfortunes, that have or shall come to the hurt, detriment or damage to the said goods and merchandise, or any part thereof."

2. (Clause 12B) "Other shipments covered hereunder are insured:

"Free of Particular Average unless caused by the vessel and/or interest insured being stranded, sunk, burst, on fire or in collision with another ship or vessel or with ice or with any substance other than water, but liable for jettison and/or washing overboard, irrespective of percentage."

3. Black's Law Dictionary (4th ed. 1966); Gilmore & Black, *The Law of Admiralty*, § 5–10 (2nd ed. 1975).

intended. However, with the exception of the shore coverage, these clauses do not define the nature of the risks covered by the policy but merely define where physically the coverage extends.

■ To recover under either the Warehouse-to-Warehouse [4] or the Marine Extension clause [5] the plaintiffs must show that an insured peril existed and the damage was proximately caused by that peril. *Lanasa Fruit Steamship & Importing Co. v. Universal Insurance Co.*, 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1937); *Northwestern Mutual Life Insurance Company v. Linard*, 498 F.2d 556, 561 (2nd Cir. 1974). Although the parties disagree, the weight of authority indicates plaintiffs bear the burden of proving coverage. *S. Felicione & Sons Fish Company v. Citizens Casualty Company of New York*, 430 F.2d 136, 138 (5th Cir. 1970), cert. denied 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); *Continental Food Products v. Insurance Company of North America*, 544 F.2d 834, 836 (5th Cir. 1977). Plaintiffs have not met that burden.

The shore coverage clause [6] provides coverage for enumerated risks occurring on shore. Plaintiffs argue that contamination while loading is a shore accident. However, since the contamination occurred within the barge's intake lines, the incident arose "on board". Therefore shore coverage does not apply. Even if it were to apply, contamination of cargo is not within the enumerated risks covered by the shore coverage clause.

III. *Recovery of Extraordinary Expenses under Landing and Warehousing clause [7]; Extra Expenses clause [8]; Sue and Labor clause [9]*

Under these provisions the insured is entitled to recover expenses associated with

---

4. (Clause 9) "This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transhipment if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be arranged in the event of transhipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the Assured."

5. (Clause 10) "This policy is extended to cover all shipments which become at risk hereunder in accordance with the following clauses . .
"I. This insurance attaches from the time the goods leave the warehouse at the place named in this policy . . . and continues until the goods are delivered to the final warehouse . . .
"II. This insurance specially to cover the goods during
(i) deviation, delay, forced discharge, reshipment and transhipment.
(ii) . . . .

"IV. This insurance shall in no case be deemed to extend to cover loss, damage, or expense proximately caused by delay or inherent vice or nature of the subject-matter insured.
Nothing in the foregoing shall be construed as overruling the F.C.&S. clause or as extending this insurance to cover any risks of war . . ."

6. (Clause 13) "Including while on docks, wharves or elsewhere on shore and/or during land transportation, risks of collision, derailment, fire, lightning, sprinkler leakage, cyclones, hurricanes, earthquakes, floods, the rising of navigable waters, or any accident to the conveyance and/or collapse and/or subsidence of docks and/or structures, and to pay loss or damage caused thereby, even though the insurance be otherwise F.P.A."

7. (Clause 20) "Notwithstanding any average warranty contained herein, these Assurers agree to pay landing, warehousing, forwarding or other expenses and/or particular charges should same be incurred, as well as any partial loss arising from transhipment. Also to pay the insured value of any package, piece or unit totally lost in loading, transhipment and/or discharge."

8. (Clause 38) "Where, by reason of a peril insured against under this policy, extra expenses are incurred to destroy, dump or otherwise dispose of the damaged goods, or where extra

losses incurred as a result of an insured peril. *American Home Assurance v. J. F. Shea*, 445 F.Supp. 365 (D.D.C.1978); *Continental Food Products v. Insurance Company of N.A.*, supra; *Reliance Insurance Company v. The Escapade*, 280 F.2d 482, 488 (5th Cir. 1960). For reasons outlined in Paragraph I, I find that the losses suffered by plaintiffs were not caused by a peril covered by the policy. Recovery under these provisions is therefore precluded.

IV. *Recovery under Inchmaree clause*

■ The purpose of the Inchmaree clause [10] is to expand the coverage of the policy beyond the perils provision. *Saskatchewan Government Insurance Office v. Spot Pack, Inc.*, 242 F.2d 385, 391 (5th Cir. 1957); *Allen N. Spooner & Son v. Connecticut Fire Insurance Company*, 314 F.2d 753, 757 (2nd Cir. 1963), cert. denied 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963). Federal law, 46 U.S.C. § 192 (Harter Act), and 46 U.S.C. § 1304(2)(a) (Carriage of Goods by Sea Act), allows a vessel owner to become exempt from liability for fault or error in navigation or management of the ship. In contrast, the shipowner must retain liability for negligence in the care and custody of the cargo. *Alf Larsen v. Insurance Company of North America*, 362 F.2d 261, 262 (9th Cir. 1966). The Inchmaree clause is intended to provide coverage to a cargo owner when a loss is due to error in navigation or management of the vessel since the carrier is exempt from liability. *Larsen*, supra at

262. Plaintiffs argue the contamination was the result of an error in management and therefore covered under the Inchmaree clause. Defendant naturally urges the court to find the loss caused by fault in the care and custody of the cargo.

The United States Supreme Court has addressed the distinction between error in management and error in care of cargo but has not articulated a clear test. *Oceanic Steam Navigation v. Aiken*, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610 (1905). The Ninth Circuit, noting that no precise definitions exist, advocates a case-by-case determination using the following test:

"If the act in question has the primary purpose of affecting the ship, it is 'in navigation or in management'; but if the primary purpose is to affect the cargo, it is not 'in navigation or in management'." *Grace Line, Inc. v. Todd Shipyards Corporation*, 500 F.2d 361, 374 (9th Cir. 1974).

Using this test, I find that the contamination of the cargo in this case was caused by fault in the care, custody, and control of the cargo. See *Grace Line*, supra at 374, fn. 11; *Knott v. Botany Worsted Mills*, 179 U.S. 69, 21 S.Ct. 30, 45 L.Ed. 90 (1900); *John Penny & Sons v. M. V. Swivel*, 266 F.Supp. 302 (D.Mass.1967). The Inchmaree clause will not provide coverage for plaintiffs' losses under the facts of this case.

V. *Recovery under Negligence clause*

■ The Negligence clause [11] provides coverage against losses due to enumerated

---

expenses are incurred in discharging from the vessel and/or craft and/or conveyance, such expenses will be recoverable in full in addition to the damage to the insured interest."

9. (Clause 40) "In case of any loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labor and travel for in and about the defense, safeguard and recovery of the said goods and merchandise, or any part thereof without prejudice to this insurance; nor shall the acts of the insured or insurers, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment; to the charges whereof the said Assurers will contribute according to the rate and quantity of the sum herein insured."

10. (Clause 24) "This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the Master, Mariners, Mates, Engineers or Pilots; provided, however, that this clause shall not be construed as covering loss arising out of delay, deterioration or loss of market, unless otherwise provided elsewhere herein."

11. (Clause 21) "The Assured are not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the bills of lading and/or charter party and/or contract of affreightment. The seaworthiness of the vessel and/or craft as between the Assured and As-

perils caused by the unseaworthiness of the vessel. To recover under this clause plaintiffs must show that the barge was unseaworthy. This unseaworthiness must then cause a loss through one of the enumerated perils: "sinking, stranding, fire, explosion, contact with seawater, or by any other cause of the nature of any of the risks assumed in the policy".

■ "Seaworthiness" depends on such factors as the type of vessel, character of the voyage, reasonable weather, navigational conditions, and type of cargo. *The Isis*, 290 U.S. 333, 346–49, 54 S.Ct. 162, 78 L.Ed. 348 (1933); *PPG Industries v. Ashland Oil Company-Thomas Petroleum Transit Division*, 592 F.2d 138, 146 (3rd Cir. 1978). A vessel is unseaworthy if she is not reasonably fit to carry cargo she has undertaken to transport. *The Silvia*, 171 U.S. 462, 464–65, 19 S.Ct. 7, 43 L.Ed. 241 (1898). I find Shaver's barge unseaworthy as a result of improper loading of cargo. See *Alaska Native Industries Co-op Ass'n v. United States*, 206 F.Supp. 767, 772 (W.D.Wash. 1962).

Plaintiffs must demonstrate that the unseaworthiness of the barge caused a loss to cargo by one or more of the enumerated perils. Since contamination is not an enumerated peril, plaintiff urges coverage under the doctrine of *ejusdem generis* [12] by suggesting the barge was in imminent danger of sinking. Although there is evidence that the caustic soda would have eventually corroded through the barge and caused it to sink, the process would have taken three to five years. This possibility is too far removed to find coverage under a provision providing for loss due to sinking. No recovery is possible under the Negligence clause of this policy.

## VI. *Recovery under General Average clauses* [13]

■ General average is a venerable doctrine of maritime law that dates back 2,800 years. [14] The doctrine provides that when a portion of ship or cargo is sacrificed to save the rest from a real and substantial peril, each owner of property saved contributes ratably to make up the loss of those whose property has been sacrificed. *Alamo Chemical Transportation Company v. M/V Overseas Valdes*, 469 F.Supp. 203, 215 (E.D.La. 1979). General average contribution exists independently of marine insurance and is owed even in the absence of cargo insurance. However, cargo owners typically insure themselves against possible obligation arising from a general average situation. This policy contains such protection.

The United States Supreme Court in *Barnard v. Adams*, 51 U.S. (10 How.) 270, 13 L.Ed. 417 (1850), described three events that created a general average situation: (1) A common danger to which ship, cargo, and crew were all exposed and which is imminent and apparently inevitable; (2) A voluntary sacrifice of a part for the benefit

---

surers is hereby admitted, and the Assurers agree that in the event unseaworthiness or a wrongful act or misconduct of shipowner, charterer, their agents or servants, shall, directly or indirectly, cause loss or damage to the cargo insured by sinking, stranding, fire, explosion, contact with seawater, or by any other cause of the nature of any of the risks assumed in the policy, the Assurers will (subject to the terms of average and other conditions of the policy) pay to an innocent Assured the resulting loss. With leave to sail with or without pilots, and to tow and assist vessels or craft in all situations and to be towed."

12. *Ejusdem generis* is a rule of construction. Where general words are used in a contract after specific terms, they are to be confined to things of the same kind or class as the things previously specified.

13. (Clause 21) "General Average, Salvage and Special Charges, as per foreign custom, payable according to foreign statement, and/or per York-Antwerp Rules and/or in accordance with the contract of affreightment, if and as required; or, failing any provision in or there be no contract of affreightment, payable in accordance with the Laws and Usages of the Port of San Francisco."

(Clause 35) "General Average and Salvage Charges are payable in full irrespective of comparison between the insured and contributory values."

14. See generally Gilmore & Black, *The Law of Admiralty*, § 5–1 (2nd ed. 1975).

of the whole; and (3) Successful avoidance of the peril. Modern law has eased the requirement of imminency and requires only that a peril be real and substantial. *Navigazione Generale Italiana v. Spencer Kellog & Sons*, 92 F.2d 41, 43 (2nd Cir. 1937), cert. denied 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937).

Two classes of general average exist: those which arise from sacrifices of part of ship or cargo made to save the whole adventure, and those which arise out of extraordinary expenses incurred for the joint benefit of ship and cargo. *McAndrews v. Thatcher*, 70 U.S. (3 Wall) 347, 18 L.Ed. 155 (1865). Expenditures made by the carrier to avert a peril must be made in good faith. *Navigazione*, supra at 43.

To require a general average contribution, there must first be a general average situation. *Navigazione*, supra at 43. Plaintiffs assert that the imminent sinking of the barge is a general average situation that requires contribution from the cargo owners. Defendant contends that no real peril existed and any alleged loss occurred at the time of contamination.

Did a general average situation exist? "Mere incidents of the voyage" not giving rise to extraordinary common danger to vessel or cargo do not require general average sacrifices. *United States v. Wessel Duval & Company*, 123 F.Supp. 318, 329 (S.D.N.Y.1954). To create a general average situation there must be "fair reason to regard a vessel in peril", and the peril must be "real and substantial". *Navigazione*, supra at 43. Although there was evidence of corrosion due to the nature of the cargo that would have eventually caused the barge to sink, no real and substantial peril existed. Compare *The Star of Hope*, 76 U.S. (9 Wall) 203, 19 L.Ed. 638 (1869); *Orient Mid-East Lines, Inc. v. A Shipment of Rice*, 496 F.2d 1032 (5th Cir. 1974).

Plaintiffs have incurred extraordinary expenses as a result of the contamination of the cargo. Nevertheless, I find that under the circumstances of this case no general average situation existed.[15] Sacrifices where there is no peril present no claim for contribution. *The Star of Hope*, supra.

Even assuming that a peril existed, defendant claims that contribution cannot be requested when the vessel owner was at fault in creating the situation. *The Irrawaddy*, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130 (1898). Vessel owners have long placed in bills of lading a provision incorporating the protections of the Harter Act, 46 U.S.C. §§ 190–196, and Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315. This provision, known as the Jason clause[16] entitles shipowners to contribution notwithstanding negligence in creating the general average situation. However, the shipowner must comply with 46 U.S.C. § 1303(1)(a) requiring due diligence to make the vessel seaworthy. *Bubble Up International Ltd. v. Transpacific Carriers Corporation*, 458 F.Supp. 1100, 1105 (S.D.N.Y.1978); *Complaint of Flota Merchante Grancolombiana*, 440 F.Supp. 704, 725–26 (S.D.N.Y.1977).

The burden of proving "due diligence" to make the vessel seaworthy falls on the vessel owner. *Orient Mid-East Lines*, supra at 1038; *Todd Shipyards Corporation v. United States*, 391 F.Supp. 588 (S.D.N.Y.1975). I find that Shaver did not meet this burden. Shaver failed to properly clean or inspect the barge's input lines. Thus if I assume that a peril existed, contribution from the cargo owner (in this case, insurance proceeds) cannot be requested. Shaver failed to use due diligence to make the barge seaworthy.

### CONCLUSION

Plaintiffs suggest a number of theories of recovery under the marine cargo insurance

---

15. A respected authority has urged the courts to be "vigilant to see that the extension by analogy of the principle of general average does not encroach upon the equally valid and more important principle that the shipowner is under a duty to employ whatever means are needful to fill his contract of carriage, even though difficulties of various sorts may result

in its costing him more than liked". Gilmore & Black, *The Law of Admiralty*, § 5–11 at 767 (2nd ed. 1975).

16. Named after the United States Supreme Court decision holding the clause valid. *The Jason*, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912).

policy. None is suited to this case. I am aided in my construction of this policy by one additional fact. Shaver *rejected* insurance coverage costing more but expressly covering the risks of contamination of cargo. I conclude that the plaintiffs did not believe contamination was covered under the policy. Plaintiffs' present attempt to include this type of loss within the coverage of the policy is an afterthought.

Judgment shall be entered for the defendant.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).