**EAGLE TERMINAL TANKERS, INC., as Owner of the "Eagle Courier," Plaintiff-Appellant,**

**v.**

**INSURANCE COMPANY OF U.S.S.R. (INGOSSTRAKH), LTD., Defendant-Appellee.**

**No. 279, Docket 80–7498.**

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1980.

Decided Jan. 5, 1981.

Lawrence J. Mahoney, New York City (Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, of counsel), for plaintiff-appellant.

Donald M. Waesche, New York City (Waesche, Sheinbaum & O'Regan, Richard W. Stone, II, New York City, of counsel), for defendant-appellee.

Healy & Baillie, New York City (Nicholas J. Healy, John P. McMahon, New York City, of counsel), for The Association of Average Adjusters of the United States, amicus curiae.

Before FEINBERG, Chief Judge, MESKILL, Circuit Judge, and PIERCE, District Judge.*

FEINBERG, Chief Judge:

This is an appeal from a grant of summary judgment in the United States District Court for the Southern District of New York, Whitman Knapp, J., to defendant appellee Insurance Company of U.S.S.R. (Ingosstrakh), Ltd. in an action brought by plaintiff-appellant Eagle Terminal Tankers, Inc. (Eagle). Plaintiff Eagle sued to recover a general average contribution from defendant, the cargo insurer, for Eagle's expenses in repairing damage to the propeller of its ship, the S. S. Eagle Courier. Because the district judge construed the applicable law and rules of general average too narrowly, we reverse the judgment of the district court and remand for further proceedings.

I

According to the record now before us, Eagle's general average claim arose in the following manner. On December 30, 1975, the S. S. Eagle Courier left Port Arthur, Texas, bearing some 26,000 metric tons of grain destined for Leningrad. At 7:45 on the evening of January 13, 1976, as the ship was maneuvering off the English coast to pick up a pilot, the first assistant engineer advised the officer on watch that he had felt a bump. Visibility was good, with only light winds, but nothing could be seen in the water near the ship at the time. The ship continued sailing toward Rotterdam, its next scheduled port of call. By 3:00 P.M. the next day, metallic scraping noises could be heard coming from the stern. The ship successfully completed its voyage, however, reaching a mooring buoy at Rotterdam two and a half hours later. Shortly thereafter, divers hired by the ship's captain conducted an underwater examination of the ship. Their report disclosed extensive damage to the propeller; among other things, the propeller's blades were bent and the propeller itself appeared to have shifted aft from the tailshaft. When turned, the propeller produced a scouring noise. This damage was serious enough, as defendant has conceded, to make repairs necessary before the voyage could be resumed. Accordingly, after a portion of the cargo was unloaded and the ship placed in drydock, the propeller shaft was replaced and a spare propeller installed. The cargo was then reloaded and the ship continued on to Leningrad, discharging its cargo there between February 9 and February 23.

Eagle declared a general average, seeking contribution for expenses arising from the Rotterdam repairs from the ship's underwriters and from defendant as insurer of the cargo. The expenses covered by the statement of general average included the costs of unloading and reloading the cargo in connection with the drydocking, as well as the costs of maintaining the ship's crew and officers during the repair period. Defendant's assessed share of these expenses totalled $126,951.61. When defendant refused to pay, Eagle brought this suit in the district court.

In May 1980, Judge Knapp granted defendant's motion for summary judgment on the ground that no general average situation existed in the circumstances of this case. 489 F.Supp. 920 (S.D.N.Y.1980). Specifically, Judge Knapp found that the ship had not been threatened by any "peril," as required under traditional principles of the law of general average and under the York-Antwerp Rules of 1950, which apply to this case in accordance with the terms of the voyage charter party.[1] Noting that the

---

* Honorable Lawrence W. Pierce, Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. Clause 2 of the voyage charter party, dated November 15, 1975, provided:

General Average shall be payable according to York/Antwerp Rules, 1950, and to be settled in New York.

damage was discovered only after the ship was safely moored, Judge Knapp concluded that "[t]he vessel could have remained moored indefinitely at Rotterdam without incurring the slightest peril to itself or its cargo." Id. at 923. That the voyage could not have been completed without the repairs was deemed "irrelevant." Id. Eagle appeals from this judgment.

## II

Resolution of the issues posed by this appeal requires an understanding of the history and content of both the law of general average and the York-Antwerp Rules. We turn first to the former.

*General Average*

█ The central principle of the law of general average is that "[w]hat is given, or sacrificed, in time of danger, for the sake of all, is to be replaced by a general contribution on the part of all who have been thereby brought to safety." R. Lowndes & G. Rudolf, The Law of General Average and the York-Antwerp Rules ¶ 1 (10th ed. J. Donaldson, C. Staughton, D. Wilson 1975) (Vol. 7 of British Shipping Laws). In this country, the principle was defined in fuller terms in the early case of *Barnard v. Adams*, 51 U.S. (10 How.) 270, 303, 13 L.Ed. 417 (1850):

> In order to constitute a case for general average three things must concur:—
>
> 1st. A common danger; a danger in which ship, cargo, and crew all participate; a danger imminent and apparently "inevitable," except by voluntarily incurring the loss of a portion of the whole to save the remainder.
>
> 2d. There must be a voluntary jettison, *jactus*, or casting away, of some portion of the joint concern for the purpose of avoiding this imminent peril, *pericula imminentis evitandi causa*, or, in other words, a transfer of the peril from the whole to a particular portion of the whole.
>
> 3d. This attempt to avoid the imminent common peril must be successful.

This formula still describes the classic general average case, but it is too narrow to encompass the full range of such cases recognized today. Two ways in which the *Barnard* formula has been liberalized are of special relevance to this appeal.

First, general average is not limited to cases involving a literal "voluntary jettison" or "casting away"; other "sacrifices" made to save the common venture may also give rise to a right of contribution from the benefited parties. As the Supreme Court observed in another leading case, *The Star of Hope*, 76 U.S. (9 Wall.) 203, 228, 19 L.Ed. 638 (1869):

> Losses which give a claim to general average are usually divided into two great classes: (1.) Those which arise from sacrifices of part of the ship or part of the cargo, purposely made in order to save the whole adventure from perishing. (2.) *Those which arise out of extraordinary expenses incurred for the joint benefit of ship and cargo.*

(Citation omitted; emphasis added.) This category of "extraordinary expenses" has long been recognized to include the costs incurred by a ship's interruption of its voyage to enter a port or similar shelter for repairs necessary for the safe completion of the venture. In *Hobson v. Lord*, 92 U.S. 397, 23 L.Ed. 613 (1876), for example, a ship had been badly damaged in a collision at sea, "and being in distress, and unable to prosecute her voyage by reason of such injuries, she proceeded to the port of Callao," her intended port of call. Id. at 400. Extensive repairs were made, requiring the discharge of the ship's cargo; "the repairs, though they were of a permanent character, were necessary to enable the ship to prosecute her voyage to its termination." Id. at 401. In holding the costs of these repairs to be subject to general average, the Court stated:

> Where the disaster occurs in the course of the voyage, and the ship is disabled,

the necessary expenses to refit her to go forward create an equity to support . . . a claim [for proportionate contribution], just as strong as a sacrifice made to escape [an imminent sea] peril, if it appears that the cargo was saved, and that the expenses incurred enabled the master to prosecute the voyage to a successful termination.

Id. at 405. The recoverable expenditures included not only the cost of the repairs, but also wages and provisions "during the consequent and necessary *interruption* of the voyage, occasioned by the disaster." Id. at 407 (emphasis in original). These principles, as will be seen below, were subsequently codified in the York-Antwerp Rules.

The second direction of liberalization of *Barnard*'s strict definition of general average acts has involved the degree of "peril" necessary to render sacrifice or extraordinary expenses recoverable. The early cases uniformly speak, as does *Barnard*, of "imminent" or "impending" peril threatening the ship. In *The Star of Hope*, for example, a fire aboard a ship carrying gunpowder and "large quantities of spirituous liquors" caused "[g]reat alarm," which "increased as the impending peril became more imminent." 76 U.S. (9 Wall.) at 225–26. The master decided to seek shelter in an unfamiliar bay, sailing in without a pilot and as a result grounding the ship on a reef. The grounding created a leak in the hull; the water that poured in extinguished the fire but made it necessary to return the ship to its previous port of call for repairs. The Supreme Court held that the expenses of the repairs could be recovered as general average costs. See also *Columbian Insurance Co. v. Ashby & Stribling*, 38 U.S. (13 Pet.) 331, 338, 10 L.Ed. 186 (1839) ("[T]he ship and cargo should be placed in a common imminent peril. . . . Hence, if there

was no imminent danger or necessity for the sacrifice, as if the jettison was merely to lighten a ship too heavily laden, by the fault of the master, in a tranquil sea, no contribution was due."); E. Congdon, General Average 11 (1952) (citing cases).

■ It is clear that the law of general average continues to require a showing of peril.[2] But in this century, perils less than "imminent" have been recognized as sufficient to create a general average situation. Writing for this court in 1937, Judge Augustus Hand expressed this changing view:

There must be fair reason to regard a vessel in peril in order to require a contribution in general average. While the courts in some cases have used expressions indicating that both in general average and in salvage cases it is essential that the property at risk be subject to an immediately impending danger, we think the "imminency" of the peril is not the critical test. *If the danger be real and substantial, a sacrifice or expenditure made in good faith for the common interest is justified, even though the advent of any catastrophe may be distant or indeed unlikely.*

*Navigazione Generale Italiana v. Spencer Kellogg & Sons*, 92 F.2d 41, 43 (2d Cir.), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937) (emphasis added). See also *Shaver Transportation Co. v. Travelers Indemnity Co.*, 481 F.Supp. 892, 897–98 (D.Or. 1979); *Todd Shipyards Corp. v. United States*, 391 F.Supp. 588, 590 (S.D.N.Y.1975); *United States v. Wessel, Duval & Co.*, 123 F.Supp. 318, 328 (S.D.N.Y.1954) (denying general average recovery in absence of evidence of "substantial peril, either present or probable in the future"). The concern underlying this more flexible view of "peril" is that the master should not be discouraged from taking timely action to avert a threat to the safety of the ship and its cargo.[3]

**2.** See, e. g., *Aktieselskabet Cuzco v. The Sucarseco*, 294 U.S. 394, 401, 55 S.Ct. 467, 470, 79 L.Ed. 942 (1935); G. Gilmore & C. Black, The Law of Admiralty § 5–6 at 254 (2d ed. 1975); L. Buglass, Marine Insurance and General Average in the United States, 122–23 (1973); E. Congdon, supra, at 11.

**3.** See R. Lowndes & G. Rudolf, supra, ¶ 51:
   Although the peril must be real, "it is not necessary that the ship should be actually in the grip, or even nearly in the grip, of the disaster that may arise from a danger. It would be a very bad thing if shipmasters had to wait until that state of things arose in

The critical issue, then, in the modern law of general average is the seriousness of the danger created by an accident or peril at sea rather than its immediacy.

## York-Antwerp Rules

Although the principles of the law of general average discussed above are relevant to this case, more immediately significant is their codification in the York-Antwerp Rules. As already indicated, see note 1 supra, these Rules were made applicable to the voyage of the Eagle Courier by the terms of the voyage charter party. A brief description of the development of the Rules will be helpful.

The movement to achieve some sort of international consensus on basic principles of general average began in Great Britain in 1860 as a response to concern over the costs, confusion, and abuses resulting from diverse national approaches to the question. The end result of many years of discussion and several conferences was the promulgation of the York-Antwerp Rules of 1890 by the Conference of the Association for the Reform and Codification of the Law of Nations (later the International Law Association). The Conference, attended by representatives of shipping and insurance interests in the United Kingdom, France, Germany, Belgium, Denmark, and the United States, adopted a set of eighteen rules designed to resolve specific, common problems of general average rather than to set out a comprehensive approach to the subject. The Rules came rapidly to be accepted as a standard code of practice by shippers in virtually all maritime states, although the original objective of uniformity through national legislation based on the Rules was not met. See generally R. Lowndes & G. Rudolf, supra, ¶¶ 481–508; Felde, General Average and the York-Antwerp Rules, 27 Tulane L.Rev. 406, 427–29 (1953).

Pressures for revision of some of the Rules and their expansion to deal with new problems led to the convening of another conference following World War I. This conference produced the York-Antwerp Rules of 1924, consisting of twenty-three "numbered" rules dealing with specific questions (mostly based on the Rules of 1890), as well as seven new "lettered" rules setting out more general definitions and principles of general average. The 1924 Rules met with general approval in the maritime states, including, it appears, the Soviet Union, see Felde, supra, 27 Tulane L.Rev. at 432–33. However, several provisions of the new Rules were strenuously opposed by shippers, insurers, and other maritime interests in the United States, which devised contractual formulas providing for only selective application of the Rules. See R. Lowndes & G. Rudolf, supra, ¶ 510.

Following World War II, the International Law Association undertook a new effort to achieve universally acceptable Rules. Representatives from thirteen countries, including the United States, met in 1949 to consider further revisions. The results were the York-Antwerp Rules of 1950, the Rules of particular interest in the present case. The principal modification introduced in 1950 was the addition of the following "Rule of Interpretation" at the beginning of the Rules:

In the adjustment of general average the following lettered and numbered Rules shall apply to the exclusion of any Law and Practice inconsistent therewith.

*Except as provided by the numbered Rules, General Average shall be adjusted according to the lettered Rules.*

(Emphasis added.) The new Rule thus gave priority to the numbered Rules, making it clear that "if the facts support a claim in general average under the numbered rules, it matters not that there has been no general average act within the meaning of Rule A." R. Lowndes & G. Rudolf, supra, ¶ 548 at 256.

order to justify them doing an act which would be a general average act."

(Quoting from Vlassopoulos v. British & Foreign Marine Ins. Co. (The "Makis"), [1929] 1 K.B. 187, 199).

Added at the request of the British delegation, the new Rule was designed to overrule the interpretation of the 1924 Rules rendered in the case of Vlassopoulos v. British & Foreign Marine Insurance Co., [1929] 1 K. B. 187. This decision, which "upset all preconceived ideas" on the relationship between the lettered and numbered Rules, see R. Lowndes & G. Rudolf, supra, ¶ 511 at 247, ¶ 545 at 255–56, held that the numbered Rules were merely specific examples of types of general average situations, subordinate to the principles set forth in the lettered Rules. To overcome the "embarrassment" this decision caused in commercial circles, id. ¶ 511 at 248, shippers began inserting a new contractual provision, known as the "Makis Agreement" (after the ship involved in *Vlassopoulos*), which made clear that recourse would be had to the lettered Rules only when none of the numbered Rules was applicable. The new Rule of Interpretation formalized this Agreement by incorporating its substance into the body of the Rules.

The 1950 Rules achieved the widespread acceptance sought by the sponsors of the 1949 Conference. In the United States, the Rules were approved by the Maritime Law Association in May 1950. See 1950 A.M.C. 895; L. Buglass, supra, at 119. In 1974, the Rules were further amended in respects not directly relevant here,[4] see R. Lowndes & G. Rudolf, supra, at ¶¶ 518–24.

■ We see no reason not to give the Rules full effect in this case, in accordance with the agreement between the parties. Although they have not been formally sanctioned on an intergovernmental basis, and thus lack the force of law, the Rules reflect an important consensus of the international shipping industry and merit "full judicial cognizance," see 2 Benedict on Admiralty § 183 at 13–14 (7th ed. 1975), at least insofar as they do not conflict with statutory or other policies of equal or greater importance. See *Sea-Land Service, Inc. v. Aetna Insurance Co.*, 545 F.2d 1313, 1315 n.* (2d Cir. 1976).

III

■ Against this background, we can now look more closely at the arguments made in this case. Appellant Eagle's central contention is that the district court erred by applying one of the lettered Rules, Rule A, to the facts presented here and by ignoring the numbered Rules. Rule A provides:

There is a general average act when, and only when, any extraordinary sacrifice or expenditure is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure.

The district court concluded that no "purpose of preserving from peril" had been shown, since the ship was safely moored when the damage was discovered and "could forever have remained at its Rotterdam mooring without being subject to any dangers except those incident to old age." 490 F.Supp. at 923. The judge thus held that no general average act had occurred.

The district court's error, appellant contends, lay in its failure to consider the applicability of two of the numbered rules addressed to precisely the type of situation involved here. Specifically, appellant points to Rule X(b), which provides:

(b) The cost of handling on board or discharging cargo, fuel or stores, whether at a port or place of loading, call or refuge, shall be admitted as general average when the handling or discharge was necessary for the common safety *or to enable damage to the ship caused by sacrifice or accident to be repaired, if the repairs were necessary for the safe prosecution of the voyage.*

(Emphasis added.) Appellant also cites Rule XI(b), a related provision:

(b) When a ship shall have entered or been detained in any port or place in consequence of accident, sacrifice or other extraordinary circumstances which render that necessary for the common safety, *or to enable damage to the ship caused by sacrifice or accident to be repaired, if the repairs were necessary for*

---

4. But see note 7 infra.

*the safe prosecution of the voyage*, the wages and maintenance of the master, officers and crew reasonably incurred during the extra period of detention in such port or place until the ship shall or should have been made ready to proceed on her original voyage, shall be admitted in general average. . . .

Fuel and stores consumed during the extra period of detention shall be admitted as general average, except such fuel and stores as are consumed in effecting repairs not allowable in general average.

Port charges incurred during the extra period of detention shall likewise be admitted as general average except such charges as are incurred solely by reason of repairs not allowable in general average.

(Emphasis added.) If, as appellant contends, these two Rules govern on the facts of this case, then they must be given precedence over the language of Rule A in conformity with the Rule of Interpretation discussed above.

Rules X(b) and XI(b), which in substance date back to the original 1890 Rules, do appear to contemplate contribution in general average toward expenses that might not qualify under Rule A. This is particularly evident in the alternative basis of recovery set out in the numbered Rules: recovery of expenses incurred "to enable damage to the ship caused by sacrifice or accident to be repaired, if the repairs were necessary for the safe prosecution of the voyage" (the safe prosecution clause). Under this clause, repairs necessary for the safe continuation of the voyage can be deemed general average acts, even if they would not be so regarded under Rule A alone. Buglass gives the following explanation:

[T]he York/Antwerp Rules adopted and legalized the so-called "artificial general average" or "general average by agreement" in the numbered rules by admitting as general average port of refuge expenses incurred not only consequent on putting into port "for the common safe-

ty," but also while detained at a port of loading or call undergoing repairs necessary for the safe prosecution of the voyage. [Knut] Selmer, a Norwegian authority, rationalizes this by reasoning that it is not the *actual* danger but rather the *eventual* danger that might arise during the subsequent part of the voyage which gave rise to the claim for general average contribution. In short, the principles laid down by Rule A are greatly modified; it is sufficient that a situation · has arisen in which the further prosecution of the voyage might entail actual danger for vessel and cargo. . . .

It seems clear . . . that under the York/Antwerp Rules, as long as a peril does exist, not only need it not be imminent, it is permissible that it be merely anticipated; and presumably, as in other general average matters, the opinion of the master will not be lightly challenged. In practice a situation of reasonable apprehension, although not of actual danger, is sufficient.

L. Buglass, supra, at 123–24. In effect, then, the safe prosecution clause is to be read not as eliminating the requirement of peril but as presuming its presence in cases where, because of accident or sacrifice, a voyage cannot safely be resumed without repairs. Such a presumption is entirely consistent with the modern interpretation of the peril requirement in *Navigazione Generale*, supra, which, as noted above, involves only a showing of "real and substantial" danger even though ultimate catastrophe "may be distant or indeed unlikely." Lowndes and Rudolf agree that the safe prosecution clause "is a notable example of the occasions where those who supported completion of the adventure as the basis of general average prevailed over those who supported the common safety." R. Lowndes & G. Rudolf, supra, ¶ 692.[5] We believe that this interpretation of Rules X(b) and XI(b) gives proper effect to their language and purpose.

Under this view of the Rules, we are satisfied that this record establishes a prima facie general average claim. Although the

**5.** The authors do, however, play down to some extent the distinction between the common

safety and safe prosecution clauses, asserting that "[t]he degree of *damage* to the ship neces-

ship here had not lost its propeller, cf. note 5 supra, the record shows that it had been seriously damaged and that its condition was deteriorating. As indicated above, the damage report revealed that the propeller "had backed down the taper of the tailshaft by about 250 mm and the top of the taper was clearly visible." As we read these facts, the ship's condition, allegedly as the result of an accident at sea, presented a "real and substantial" danger of loss or complete incapacitation of the propeller—and consequent peril—if the ship had still been at sea or if it returned to sea without repairs. Defendant implicitly recognizes this threat by conceding the necessity of the repairs prior to the resumption of the voyage. Under these circumstances, we believe the requirements for a prima facie claim under Rules X(b) and XI(b) have been satisfied.[6]

We are aware of the different view of these Rules taken by the Fifth Circuit in *Orient Mid-East Lines v. A Shipment of Rice*, 496 F.2d 1032, 1038–39 (5th Cir. 1974), cert. denied, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975). But we respectfully disagree with the assumption in that case that "Rules X and XI are limited to actions taken 'for the common safety,'" id. at 1039 —an assumption that overlooks the alterna-

tive basis of recovery set forth in the safe prosecution clause. We note, in any event, that the primary basis of the court's decision was not the inapplicability of the Rules to the facts there but its finding that general average recovery was unavailable in any event because the damage had been incurred in the process of making the ship seaworthy. Id. at 1038.

Moreover, we see no basis here for the concern voiced in *Orient Mid-East Lines*, id. at 1039, over the possibility of conflict between the Rules and the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300 et seq. In particular, we note that the record before us presents no issues of negligence or unseaworthiness, which might implicate COGSA policies with respect to limitations of liability, see 46 U.S.C. § 1303(8).

IV

In light of these considerations, we conclude that the district court erred in relying solely on Rule A to the exclusion of Rules X(b) and XI(b). Giving the latter precedence, as required by the Rule of Interpretation, we are persuaded that Eagle presented a valid prima facie claim.

Of course, we are concerned here with the grant of summary judgment; our holding is merely that a claim has been stated,

---

sary to meet the requirements of the expression is the same as—no less than—would be necessary to endanger the 'common safety' of the adventure if the vessel were at sea." As an example of the requisite "damage," the authors cite the loss of a propeller at sea, rendering a ship "unfit to encounter the ordinary perils of the sea." Id. ¶ 692 at 330. Under such circumstances, they note, "once within a port where repairs can be effected, safety will have been attained"; the safe prosecution clause "merely provides for a situation in port which, if the ship were at sea, would endanger the common safety." Id.

This interpretation appears to reflect a narrower reading of the safe prosecution clause than that contained in the previous edition of the same work, which asserted that the clause "contemplates repairs to avert a frustration of the adventure and is to be contrasted with repairs 'necessary for the common safety' which is concerned with physical safety." R. Lowndes & G. Rudolf, The Law of General Average ¶ 708 at 350 (9th ed. J. Donaldson, C. Ellis, C. Staughton 1964). The earlier edition also specifically recognized that the safe prose-

cution clause would permit general average contribution under circumstances "which would *not* be a general average act either at common law or under Rule A unless incurred for the common safety or as a direct consequence of a general average act." Id. ¶ 671 at 336.

The change in emphasis in the 10th edition may reflect a recent trend toward tightened definition of general average acts. See, e. g., R. Lowndes & G. Rudolf (10th edition), supra, ' 694 at 331, noting that at the 1974 Conference to amend the Rules "some effort was made to reduce the incidence of general average costs by increasing the stringency of the criteria by which it should be determined whether a general average situation exists." But see G. Gilmore & C. Black, supra, § 5–16 at 271.

6. Compare *Empire Stevedoring Co. v. Oceanic Adjusters, Ltd.*, 315 F.Supp. 921 (S.D.N.Y. 1970), a case whose facts are similar to those here and in which the validity of the general average claim appears to have been assumed without consideration of the issue of peril.

not that it has been proved. Eagle still bears the burden of showing that the requirements of the Rules have been satisfied. See Rule E of the 1950 Rules, providing that "[t]he onus of proof is upon the party claiming in general average to show that the loss or expense claimed is properly allowable as general average." See also L. Buglass, supra, at 130. Thus, for example, appellant must show that the damage requiring repair was the result of an "accident," rather than a latent defect attributable to the ship's unseaworthiness.[7] We express no views on this or any other factual issue that may arise at trial.

The judgment is reversed and the case remanded for further proceedings.

---

**7.** It is worth noting in this connection two amendments to the numbered Rules adopted in 1974 designed to make clear that damage must have been incurred as the result of accident during the voyage. An amendment to Rule X(b) qualified the availability of contribution under that rule by excluding "cases where the damage to the ship is discovered at a port or place of loading or call without any accident or other extraordinary circumstance connected with such damage having taken place during the voyage." Rule XI(b) was similarly amended by the addition of a provision to the same effect. See R. Lowndes & G. Rudolf, supra, ⁋⁋ 694, 729–30.